# UNITED STATES v. VERDUGO-URQUIDEZ

No. 88–1353.   Argued November 7, 1989—Decided February 28, 1990

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. KENNEDY, J., filed a concurring opinion, *post*, p. 275. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 279. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 279. BLACKMUN, J., filed a dissenting opinion, *post*, p. 297.

*Lawrence S. Robbins* argued the cause for the United States. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Dennis,* and *Deputy Solicitor General Bryson.*

*Michael Pancer* argued the cause for respondent. With him on the brief were *Charles L. Goldberg* and *Patrick Q. Hall.*\*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The question presented by this case is whether the Fourth Amendment applies to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country. We hold that it does not.

---

\**Kent S. Scheidegger* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging reversal.

*John A. Powell, Paul L. Hoffman,* and *David D. Cole* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

Respondent Rene Martin Verdugo-Urquidez is a citizen and resident of Mexico. He is believed by the United States Drug Enforcement Agency (DEA) to be one of the leaders of a large and violent organization in Mexico that smuggles narcotics into the United States. Based on a complaint charging respondent with various narcotics-related offenses, the Government obtained a warrant for his arrest on August 3, 1985. In January 1986, Mexican police officers, after discussions with United States marshals, apprehended Verdugo-Urquidez in Mexico and transported him to the United States Border Patrol station in Calexico, California. There, United States marshals arrested respondent and eventually moved him to a correctional center in San Diego, California, where he remains incarcerated pending trial.

Following respondent's arrest, Terry Bowen, a DEA agent assigned to the Calexico DEA office, decided to arrange for searches of Verdugo-Urquidez's Mexican residences located in Mexicali and San Felipe. Bowen believed that the searches would reveal evidence related to respondent's alleged narcotics trafficking activities and his involvement in the kidnaping and torture-murder of DEA Special Agent Enrique Camarena Salazar (for which respondent subsequently has been convicted in a separate prosecution. See *United States* v. *Verdugo-Urquidez*, No. CR–87–422–ER (CD Cal., Nov. 22, 1988)). Bowen telephoned Walter White, the Assistant Special Agent in charge of the DEA office in Mexico City, and asked him to seek authorization for the search from the Director General of the Mexican Federal Judicial Police (MFJP). After several attempts to reach high ranking Mexican officials, White eventually contacted the Director General, who authorized the searches and promised the cooperation of Mexican authorities. Thereafter, DEA agents working in concert with officers of the MFJP searched respondent's properties in Mexicali and San Felipe and seized certain documents. In particular, the search of the Mexicali residence uncovered a tally sheet, which the Government

believes reflects the quantities of marijuana smuggled by Verdugo-Urquidez into the United States.

The District Court granted respondent's motion to suppress evidence seized during the searches, concluding that the Fourth Amendment applied to the searches and that the DEA agents had failed to justify searching respondent's premises without a warrant. A divided panel of the Court of Appeals for the Ninth Circuit affirmed. 856 F. 2d 1214 (1988). It cited this Court's decision in *Reid* v. *Covert*, 354 U. S. 1 (1957), which held that American citizens tried by United States military authorities in a foreign country were entitled to the protections of the Fifth and Sixth Amendments, and concluded that "[t]he Constitution imposes substantive constraints on the federal government, even when it operates abroad." 856 F. 2d, at 1218. Relying on our decision in *INS* v. *Lopez-Mendoza*, 468 U. S. 1032 (1984), where a majority of Justices assumed that illegal aliens in the United States have Fourth Amendment rights, the Ninth Circuit majority found it "difficult to conclude that Verdugo-Urquidez lacks these same protections." 856 F. 2d, at 1223. It also observed that persons in respondent's position enjoy certain trial-related rights, and reasoned that "[i]t would be odd indeed to acknowledge that Verdugo-Urquidez is entitled to due process under the fifth amendment, and to a fair trial under the sixth amendment, . . . and deny him the protection from unreasonable searches and seizures afforded under the fourth amendment." *Id.*, at 1224. Having concluded that the Fourth Amendment applied to the searches of respondent's properties, the court went on to decide that the searches violated the Constitution because the DEA agents failed to procure a search warrant. Although recognizing that "an American search warrant would be of no legal validity in Mexico," the majority deemed it sufficient that a warrant would have "substantial constitutional value in this country," because it would reflect a magistrate's determination

that there existed probable cause to search and would define the scope of the search. *Id.*, at 1230.

The dissenting judge argued that this Court's statement in *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 318 (1936), that "[n]either the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens," foreclosed any claim by respondent to Fourth Amendment rights. More broadly, he viewed the Constitution as a "compact" among the people of the United States, and the protections of the Fourth Amendment were expressly limited to "the people." We granted certiorari, 490 U. S. 1019 (1989).

Before analyzing the scope of the Fourth Amendment, we think it significant to note that it operates in a different manner than the Fifth Amendment, which is not at issue in this case. The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. See *Malloy* v. *Hogan,* 378 U. S. 1 (1964). Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial. *Kastigar* v. *United States*, 406 U. S. 441, 453 (1972). The Fourth Amendment functions differently. It prohibits "unreasonable searches and seizures" whether or not the evidence is sought to be used in a criminal trial, and a violation of the Amendment is "fully accomplished" at the time of an unreasonable governmental intrusion. *United States* v. *Calandra,* 414 U. S. 338, 354 (1974); *United States* v. *Leon,* 468 U. S. 897, 906 (1984). For purposes of this case, therefore, if there were a constitutional violation, it occurred solely in Mexico. Whether evidence obtained from respondent's Mexican residences should be excluded at trial in the United States is a remedial question separate from the existence *vel non* of the constitutional violation. *Calandra, supra,* at 354; *Leon, supra,* at 906.

The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

That text, by contrast with the Fifth and Sixth Amendments, extends its reach only to "the people." Contrary to the suggestion of *amici curiae* that the Framers used this phrase "simply to avoid [an] awkward rhetorical redundancy," Brief for American Civil Liberties Union et al. as *Amici Curiae* 12, n. 4, "the people" seems to have been a term of art employed in select parts of the Constitution. The Preamble declares that the Constitution is ordained and established by "the People of the United States." The Second Amendment protects "the right of the people to keep and bear Arms," and the Ninth and Tenth Amendments provide that certain rights and powers are retained by and reserved to "the people." See also U. S. Const., Amdt. 1 ("Congress shall make no law . . . abridging . . . *the right of the people* peaceably to assemble") (emphasis added); Art. I, §2, cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year *by the People of the several States*") (emphasis added). While this textual exegesis is by no means conclusive, it suggests that "the, people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community. See *United States ex rel. Turner* v. *Williams*, 194 U. S. 279, 292 (1904) (Excludable alien is not entitled to First Amendment rights, because "[h]e does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law"). The language of these Amendments contrasts with the words

"person" and "accused" used in the Fifth and Sixth Amendments regulating procedure in criminal cases.

What we know of the history of the drafting of the Fourth Amendment also suggests that its purpose was to restrict searches and seizures which might be conducted by the United States in domestic matters. The Framers originally decided not to include a provision like the Fourth Amendment, because they believed the National Government lacked power to conduct searches and seizures. See C. Warren, The Making of the Constitution 508–509 (1928); The Federalist No. 84, p. 513 (C. Rossiter ed. 1961) (A. Hamilton); 1 Annals of Cong. 437 (1789) (statement of J. Madison). Many disputed the original view that the Federal Government possessed only narrow delegated powers over domestic affairs, however, and ultimately felt an Amendment prohibiting unreasonable searches and seizures was necessary. Madison, for example, argued that "there is a clause granting to Congress the power to make all laws which shall be necessary and proper for carrying into execution all of the powers vested in the Government of the United States," and that general warrants might be considered "necessary" for the purpose of collecting revenue. *Id.*, at 438. The driving force behind the adoption of the Amendment, as suggested by Madison's advocacy, was widespread hostility among the former colonists to the issuance of writs of assistance empowering revenue officers to search suspected places for smuggled goods, and general search warrants permitting the search of private houses, often to uncover papers that might be used to convict persons of libel. See *Boyd* v. *United States*, 116 U. S. 616, 625–626 (1886). The available historical data show, therefore, that the purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government; it was never suggested that the provision was intended to restrain the actions of the Federal Government against aliens outside of the United States territory.

There is likewise no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters. Only seven years after the ratification of the Amendment, French interference with American commercial vessels engaged in neutral trade triggered what came to be known as the "undeclared war" with France. In an Act to "protect the Commerce of the United States" in 1798, Congress authorized President Adams to "instruct the commanders of the public armed vessels which are, or which shall be employed in the service of the United States, to subdue, seize and take any armed French vessel, which shall be found within the jurisdictional limits of the United States, or elsewhere, on the high seas." § 1 of An Act Further to Protect the Commerce of the United States, ch. 68, 1 Stat. 578. This public naval force consisted of only 45 vessels, so Congress also gave the President power to grant to the owners of private armed ships and vessels of the United States "special commissions," which would allow them "the same license and authority for the subduing, seizing and capturing any armed French vessel, and for the recapture of the vessels, goods and effects of the people of the United States, as the public armed vessels of the United States may by law have." § 2, 1 Stat. 579; see U. S. Const., Art. I, § 8, cl. 11 (Congress has power to grant letters of marque and reprisal). Under the latter provision, 365 private armed vessels were commissioned before March 1, 1799, see G. Allen, Our Naval War with France 59 (1967); together, these enactments resulted in scores of seizures of foreign vessels under congressional authority. See M. Palmer, Stoddert's War: Naval Operations During the Quasi-War with France, 1798–1801, p. 235 (1987). See also An Act Further to Suspend the Commercial Intercourse Between the United States and France, ch. 2, 1 Stat. 613. Some commanders were held liable by this Court for unlawful seizures because their actions were beyond the scope of the congres-

sional grant of authority, see, *e. g., Little* v. *Barreme,* 2 Cranch 170, 177–178 (1804); cf. *Talbot* v. *Seeman,* 1 Cranch 1, 31 (1801) (seizure of neutral ship lawful where American captain had probable cause to believe vessel was French), but it was never suggested that the Fourth Amendment restrained the authority of Congress or of United States agents to conduct operations such as this.

The global view taken by the Court of Appeals of the application of the Constitution is also contrary to this Court's decisions in the *Insular Cases,* which held that not every constitutional provision applies to governmental activity even where the United States has sovereign power. See, *e. g., Balzac* v. *Porto Rico,* 258 U. S. 298 (1922) (Sixth Amendment right to jury trial inapplicable in Puerto Rico); *Ocampo* v. *United States,* 234 U. S. 91 (1914) (Fifth Amendment grand jury provision inapplicable in Philippines); *Dorr* v. *United States,* 195 U. S. 138 (1904) (jury trial provision inapplicable in Philippines); *Hawaii* v. *Mankichi,* 190 U. S. 197 (1903) (provisions on indictment by grand jury and jury trial inapplicable in Hawaii); *Downes* v. *Bidwell,* 182 U. S. 244 (1901) (Revenue Clauses of Constitution inapplicable to Puerto Rico). In *Dorr,* we declared the general rule that in an unincorporated territory—one not clearly destined for statehood—Congress was not required to adopt "a system of laws which shall include the right of trial by jury, and that *the Constitution does not, without legislation and of its own force, carry such right to territory so situated.*" 195 U. S., at 149 (emphasis added). Only "fundamental" constitutional rights are guaranteed to inhabitants of those territories. *Id.,* at 148; *Balzac, supra,* at 312–313; see *Examining Board of Engineers, Architects and Surveyors* v. *Flores de Otero,* 426 U. S. 572, 599, n. 30 (1976). If that is true with respect to territories ultimately governed by Congress, respondent's claim that the protections of the Fourth Amendment extend to aliens in foreign nations is even weaker. And certainly, it is not open to us in light of the *Insular Cases* to endorse the

view that every constitutional provision applies wherever the United States Government exercises its power.

Indeed, we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States. In *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950), the Court held that enemy aliens arrested in China and imprisoned in Germany after World War II could not obtain writs of habeas corpus in our federal courts on the ground that their convictions for war crimes had violated the Fifth Amendment and other constitutional provisions. The *Eisentrager* opinion acknowledged that in some cases constitutional provisions extend beyond the citizenry; "[t]he alien . . . has been accorded a generous and ascending scale of rights as he increases his identity with our society." *Id.*, at 770. But our rejection of extraterritorial application of the Fifth Amendment was emphatic:

> "Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. *Cf. Downes* v. *Bidwell*, 182 U. S. 244 [(1901)]. None of the learned commentators on our Constitution has even hinted at it. The practice of every modern government is opposed to it." *Id.*, at 784.

If such is true of the Fifth Amendment, which speaks in the relatively universal term of "person," it would seem even more true with respect to the Fourth Amendment, which applies only to "the people."

To support his all-encompassing view of the Fourth Amendment, respondent points to language from the plurality opinion in *Reid* v. *Covert*, 354 U. S. 1 (1957). *Reid* involved an attempt by Congress to subject the wives of American servicemen to trial by military tribunals without the protection of the Fifth and Sixth Amendments. The Court held that it was unconstitutional to apply the Uniform Code of Military

Justice to the trials of the American women for capital crimes. Four Justices "reject[ed] the idea that when the United States acts *against citizens* abroad it can do so free of the Bill of Rights." *Id.,* at 5 (emphasis added). The plurality went on to say:

> "The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish *a citizen* who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land." *Id.,* at 5–6 (emphasis added; footnote omitted).

Respondent urges that we interpret this discussion to mean that federal officials are constrained by the Fourth Amendment wherever and against whomever they act. But the holding of *Reid* stands for no such sweeping proposition: it decided that United States citizens stationed abroad could invoke the protection of the Fifth and Sixth Amendments. The concurrences by Justices Frankfurter and Harlan in *Reid* resolved the case on much narrower grounds than the plurality and declined even to hold that United States citizens were entitled to the full range of constitutional protections in all overseas criminal prosecutions. See *id.,* at 75 (Harlan, J., concurring in result) ("I agree with my brother FRANKFURTER that . . . we have before us a question analogous, ultimately, to issues of due process; one can say, in fact, that the question of which specific safeguards of the Constitution are appropriately to be applied in a particular context overseas can be reduced to the issue of what process is 'due' a defendant in the particular circumstances of a particular case"). Since respondent is not a United States citizen, he can derive no comfort from the *Reid* holding.

Verdugo-Urquidez also relies on a series of cases in which we have held that aliens enjoy certain constitutional rights.

See, *e. g., Plyler* v. *Doe,* 457 U. S. 202, 211–212 (1982) (illegal aliens protected by Equal Protection Clause); *Kwong Hai Chew* v. *Colding,* 344 U. S. 590, 596 (1953) (resident alien is a "person" within the meaning of the Fifth Amendment); *Bridges* v. *Wixon,* 326 U. S. 135, 148 (1945) (resident aliens have First Amendment rights); *Russian Volunteer Fleet* v. *United States,* 282 U. S. 481 (1931) (Just Compensation Clause of Fifth Amendment); *Wong Wing* v. *United States,* 163 U. S. 228, 238 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369 (1886) (Fourteenth Amendment protects resident aliens). These cases, however, establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country. See, *e. g., Plyler, supra,* at 212 (The provisions of the Fourteenth Amendment " 'are universal in their application, *to all persons within the territorial jurisdiction . . .* '") (quoting *Yick Wo, supra,* at 369); *Kwong Hai Chew, supra,* at 596, n. 5 ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But *once an alien lawfully enters and resides in this country* he becomes invested with the rights guaranteed by the Constitution to all people within our borders") (quoting *Bridges, supra,* at 161 (concurring opinion) (emphasis added)). Respondent is an alien who has had no previous significant voluntary connection with the United States, so these cases avail him not.

JUSTICE STEVENS' concurrence in the judgment takes the view that even though the search took place in Mexico, it is nonetheless governed by the requirements of the Fourth Amendment because respondent was "lawfully present in the United States . . . even though he was brought and held here against his will." *Post,* at 279. But this sort of presence—lawful but involuntary—is not of the sort to indicate any substantial connection with our country. The extent to which respondent might claim the protection of the Fourth Amend-

ment if the duration of his stay in the United States were to be prolonged—by a prison sentence, for example—we need not decide. When the search of his house in Mexico took place, he had been present in the United States for only a matter of days. We do not think the applicability of the Fourth Amendment to the search of premises in Mexico should turn on the fortuitous circumstance of whether the custodian of its nonresident alien owner had or had not transported him to the United States at the time the search was made.

The Court of Appeals found some support for its holding in our decision in *INS* v. *Lopez-Mendoza*, 468 U. S. 1032 (1984), where a majority of Justices assumed that the Fourth Amendment applied to illegal aliens in the United States. We cannot fault the Court of Appeals for placing some reliance on the case, but our decision did not expressly address the proposition gleaned by the court below. The question presented for decision in *Lopez-Mendoza* was limited to whether the Fourth Amendment's exclusionary rule should be extended to civil deportation proceedings; it did not encompass whether the protections of the Fourth Amendment extend to illegal aliens in this country. The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, compare, *e. g.*, *Maine* v. *Thiboutot*, 448 U. S. 1 (1980) (assuming State is a "person" within the meaning of 42 U. S. C. § 1983), with *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58 (1989) (State is not a "person"), and such assumptions—even on jurisdictional issues—are not binding in future cases that directly raise the questions. *Id.*, at 63, n. 4; *Hagans* v. *Lavine*, 415 U. S. 528, 535, n. 5 (1974). Our statements in *Lopez-Mendoza* are therefore not dispositive of how the Court would rule on a Fourth Amendment claim by illegal aliens in the United States if such a claim were squarely before us. Even assuming such aliens would be entitled to Fourth Amendment protections, their situation is

different from respondent's. The illegal aliens in *Lopez-Mendoza* were in the United States voluntarily and presumably had accepted some societal obligations; but respondent had no voluntary connection with this country that might place him among "the people" of the United States.

Respondent also contends that to treat aliens differently from citizens with respect to the Fourth Amendment somehow violates the equal protection component of the Fifth Amendment to the United States Constitution. He relies on *Graham* v. *Richardson*, 403 U. S. 365 (1971), and *Foley* v. *Connelie*, 435 U. S. 291 (1978), for this proposition. But the very cases previously cited with respect to the protection extended by the Constitution to aliens undermine this claim. They are constitutional decisions of this Court expressly according differing protection to aliens than to citizens, based on our conclusion that the particular provisions in question were not intended to extend to aliens in the same degree as to citizens. Cf. *Mathews* v. *Diaz*, 426 U. S. 67, 79–80 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens").

Not only are history and case law against respondent, but as pointed out in *Johnson* v. *Eisentrager*, 393 U. S. 763 (1950), the result of accepting his claim would have significant and deleterious consequences for the United States in conducting activities beyond its boundaries. The rule adopted by the Court of Appeals would apply not only to law enforcement operations abroad, but also to other foreign policy operations which might result in "searches or seizures." The United States frequently employs Armed Forces outside this country—over 200 times in our history—for the protection of American citizens or national security. Congressional Research Service, Instances of Use of United States Armed Forces Abroad, 1798–1989 (E. Collier ed. 1989). Application of the Fourth Amendment to those circumstances could significantly disrupt the ability of the political

branches to respond to foreign situations involving our national interest.  Were respondent to prevail, aliens with no attachment to this country might well bring actions for damages to remedy claimed violations of the Fourth Amendment in foreign countries or in international waters.  See *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U. S. 388 (1971); cf. *Tennessee* v. *Garner*, 471 U. S. 1 (1985); *Graham* v. *Connor*, 490 U. S. 386 (1989).  Perhaps a *Bivens* action might be unavailable in some or all of these situations due to "'special factors counselling hesitation,'" see *Chappell* v. *Wallace*, 462 U. S. 296, 298 (1983) (quoting *Bivens, supra,* at 396), but the Government would still be faced with case-by-case adjudications concerning the availability of such an action.  And even were *Bivens* deemed wholly inapplicable in cases of foreign activity, that would not obviate the problems attending the application of the Fourth Amendment abroad to aliens.  The Members of the Executive and Legislative Branches are sworn to uphold the Constitution, and they presumably desire to follow its commands.  But the Court of Appeals' global view of its applicability would plunge them into a sea of uncertainty as to what might be reasonable in the way of searches and seizures conducted abroad.  Indeed, the Court of Appeals held that absent exigent circumstances, United States agents could not effect a "search or seizure" for law enforcement purposes in a foreign country without first obtaining a warrant—which would be a dead letter outside the United States—from a magistrate in this country.  Even if no warrant were required, American agents would have to articulate specific facts giving them probable cause to undertake a search or seizure if they wished to comply with the Fourth Amendment as conceived by the Court of Appeals.

We think that the text of the Fourth Amendment, its history, and our cases discussing the application of the Constitution to aliens and extraterritorially require rejection of respondent's claim.  At the time of the search, he was a citizen and resident of Mexico with no voluntary attachment to the

United States, and the place searched was located in Mexico. Under these circumstances, the Fourth Amendment has no application.

For better or for worse, we live in a world of nation-states in which our Government must be able to "functio[n] effectively in the company of sovereign nations." *Perez* v. *Brownell,* 356 U. S. 44, 57 (1958). Some who violate our laws may live outside our borders under a regime quite different from that which obtains in this country. Situations threatening to important American interests may arise halfway around the globe, situations which in the view of the political branches of our Government require an American response with armed force. If there are to be restrictions on searches and seizures which occur incident to such American action, they must be imposed by the political branches through diplomatic understanding, treaty, or legislation.

The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE KENNEDY, concurring.

I agree that no violation of the Fourth Amendment has occurred and that we must reverse the judgment of the Court of Appeals. Although some explanation of my views is appropriate given the difficulties of this case, I do not believe they depart in fundamental respects from the opinion of the Court, which I join.

In cases involving the extraterritorial application of the Constitution, we have taken care to state whether the person claiming its protection is a citizen, see, *e. g., Reid* v. *Covert,* 354 U. S. 1 (1957), or an alier, see, *e. g., Johnson* v. *Eisentrager,* 339 U. S. 763 (1950). The distinction between citizens and aliens follows from the undoubted proposition that the Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory. We should note, however, that the absence of

this relation does not depend on the idea that only a limited class of persons ratified the instrument that formed our Government. Though it must be beyond dispute that persons outside the United States did not and could not assent to the Constitution, that is quite irrelevant to any construction of the powers conferred or the limitations imposed by it. As Justice Story explained in his Commentaries:

> "A government may originate in the voluntary compact or assent of the people of several states, or of a people never before united, and yet when adopted and ratified by them, be no longer a matter resting in compact; but become an executed government or constitution, a fundamental law, and not a mere league. But the difficulty in asserting it to be a compact between the people of each state, and all the people of the other states is, that the constitution itself contains no such expression, and no such designation of parties." 1 Commentaries on the Constitution § 365, p. 335 (1833) (footnote omitted).

The force of the Constitution is not confined because it was brought into being by certain persons who gave their immediate assent to its terms.

For somewhat similar reasons, I cannot place any weight on the reference to "the people" in the Fourth Amendment as a source of restricting its protections. With respect, I submit these words do not detract from its force or its reach. Given the history of our Nation's concern over warrantless and unreasonable searches, explicit recognition of "the right of the people" to Fourth Amendment protection may be interpreted to underscore the importance of the right, rather than to restrict the category of persons who may assert it. The restrictions that the United States must observe with reference to aliens beyond its territory or jurisdiction depend, as a consequence, on general principles of interpretation, not on an inquiry as to who formed the Constitution or a construction that some rights are mentioned as being those of "the people."

I take it to be correct, as the plurality opinion in *Reid* v. *Covert* sets forth, that the Government may act only as the Constitution authorizes, whether the actions in question are foreign or domestic. See 354 U. S., at 6. But this principle is only a first step in resolving this case. The question before us then becomes what constitutional standards apply when the Government acts, in reference to an alien, within its sphere of foreign operations. We have not overruled either *In re Ross*, 140 U. S. 453 (1891), or the so-called *Insular Cases* (*i. e.*, *Downes* v. *Bidwell*, 182 U. S. 244 (1901); *Hawaii* v. *Mankichi*, 190 U. S. 197 (1903); *Dorr* v. *United States*, 195 U. S. 138 (1904); *Balzac* v. *Porto Rico*, 258 U. S. 298 (1922)). These authorities, as well as *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 318 (1936), stand for the proposition that we must interpret constitutional protections in light of the undoubted power of the United States to take actions to assert its legitimate power and authority abroad. Justice Harlan made this observation in his opinion concurring in the judgment in *Reid* v. *Covert:*

> "I cannot agree with the suggestion that every provision of the Constitution must always be deemed automatically applicable to American citizens in every part of the world. For *Ross* and the *Insular Cases* do stand for an important proposition, one which seems to me a wise and necessary gloss on our Constitution. The proposition is, of course, not that the Constitution 'does not apply' overseas, but that there are provisions in the Constitution which do not *necessarily* apply in all circumstances in every foreign place. In other words, it seems to me that the basic teaching of *Ross* and the *Insular Cases* is that there is no rigid and abstract rule that Congress, as a condition precedent to exercising power over Americans overseas, must exercise it subject to all the guarantees of the Constitution, no matter what the conditions and considerations are that would make adherence to a

specific guarantee altogether impracticable and anomalous." 354 U. S., at 74.

The conditions and considerations of this case would make adherence to the Fourth Amendment's warrant requirement impracticable and anomalous. Just as the Constitution in the *Insular Cases* did not require Congress to implement all constitutional guarantees in its territories because of their "wholly dissimilar traditions and institutions," the Constitution does not require United States agents to obtain a warrant when searching the foreign home of a nonresident alien. If the search had occurred in a residence within the United States, I have little doubt that the full protections of the Fourth Amendment would apply. But that is not this case. The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country. For this reason, in addition to the other persuasive justifications stated by the Court, I agree that no violation of the Fourth Amendment has occurred in the case before us. The rights of a citizen, as to whom the United States has continuing obligations, are not presented by this case.

I do not mean to imply, and the Court has not decided, that persons in the position of the respondent have no constitutional protection. The United States is prosecuting a foreign national in a court established under Article III, and all of the trial proceedings are governed by the Constitution. All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant. Indeed, as Justice Harlan put it, "the question of which specific safeguards . . . are appropriately to be applied in a particular context . . . can be reduced to the issue of what process is 'due' a defendant in the particular circumstances of a particular case." *Reid, supra,* at 75. Nothing approaching a violation of due process has occurred in this case.

JUSTICE STEVENS, concurring in the judgment.

In my opinion aliens who are lawfully present in the United States are among those "people" who are entitled to the protection of the Bill of Rights, including the Fourth Amendment. Respondent is surely such a person even though he was brought and held here against his will. I therefore cannot join the Court's sweeping opinion.* I do agree, however, with the Government's submission that the search conducted by the United States agents with the approval and cooperation of the Mexican authorities was not "unreasonable" as that term is used in the first Clause of the Amendment. I do not believe the Warrant Clause has any application to searches of noncitizens' homes in foreign jurisdictions because American magistrates have no power to authorize such searches. I therefore concur in the Court's judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Today the Court holds that although foreign nationals must abide by our laws even when in their own countries, our Government need not abide by the Fourth Amendment when it investigates them for violations of our laws. I respectfully dissent.

I

Particularly in the past decade, our Government has sought, successfully, to hold foreign nationals criminally liable under federal laws for conduct committed entirely beyond the territorial limits of the United States that nevertheless has effects

---

*The Court's interesting historical discussion is simply irrelevant to the question whether an alien lawfully within the sovereign territory of the United States is entitled to the protection of our laws. Nor is comment on illegal aliens' entitlement to the protections of the Fourth Amendment necessary to resolve this case.

in this country. Foreign nationals must now take care not to violate our drug laws,[1] our antitrust laws,[2] our securities laws,[3] and a host of other federal criminal statutes.[4] The

---

[1] Federal drug enforcement statutes written broadly enough to permit extraterritorial application include laws proscribing the manufacture, distribution, or possession with intent to manufacture or distribute of controlled substances on board vessels, see 46 U. S. C. App. § 1903(h) (1982 ed., Supp. V) ("This section is intended to reach acts . . . committed outside the territorial jurisdiction of the United States"), the possession, manufacture, or distribution of a controlled substance for purposes of unlawful importation, see 21 U. S. C. § 959(c) (same), and conspiracy to violate federal narcotics laws, see *Chua Han Mow* v. *United States*, 730 F. 2d 1308, 1311–1312 (CA9 1984) (applying 21 U. S. C. §§ 846 and 963 to conduct by a Malaysian citizen in Malaysia), cert. denied, 470 U. S. 1031 (1985).

[2] The Sherman Act defines "person" to include foreign corporations, 15 U. S. C. § 7, and has been applied to certain conduct beyond the territorial limits of the United States by foreign corporations and nationals for at least 45 years. See *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 443–444 (CA2 1945).

[3] Foreign corporations may be liable under § 10(b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78j(b), for transactions that occur outside the United States if the transactions involve stock registered and listed on a national securities exchange and the alleged conduct is "detrimental to the interests of American investors." *Schoenbaum* v. *Firstbrook*, 405 F. 2d 200, 208 (CA2), rev'd on rehearing on other grounds, 405 F. 2d 215 (CA2 1968) (en banc), cert. denied, 395 U. S. 906 (1969).

[4] See, *e. g.*, 18 U. S. C. § 32(b) (violence against an individual aboard or destruction of any "civil aircraft registered in a country other than the United States while such aircraft is in flight"); § 111 (assaulting, resisting, or impeding certain officers or employees); § 115 (influencing, impeding, or retaliating against a federal official by threatening or injuring a family member); §§ 1114, 1117 (murder, attempted murder, and conspiracy to murder certain federal officers and employees); § 1201(a)(5) (kidnaping of federal officers and employees listed in § 1114); § 1201(e) (kidnaping of "an internationally protected person," if the alleged offender is found in the United States, "irrespective of the place where the offense was committed or the nationality of the victim or the alleged offender"); § 1203 (hostage taking outside the United States, if the offender or the person seized is a United States national, if the offender is found in the United States, or if "the governmental organization sought to be compelled is the Government of the United States"); § 1546 (fraud and misuse of visas, permits, and

enormous expansion of federal criminal jurisdiction outside our Nation's boundaries has led one commentator to suggest that our country's three largest exports are now "rock music, blue jeans, and United States law." Grundman, The New Imperialism: The Extraterritorial Application of United States Law, 14 Int'l Law. 257, 257 (1980).

The Constitution is the source of Congress' authority to criminalize conduct, whether here or abroad, and of the Executive's authority to investigate and prosecute such conduct. But the same Constitution also prescribes limits on our Government's authority to investigate, prosecute, and punish criminal conduct, whether foreign or domestic. As a plurality of the Court noted in *Reid* v. *Covert*, 354 U. S. 1, 5–6 (1957): "The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution." (Footnotes omitted.) See also *ante*, at 277 (KENNEDY, J., concurring) ("[T]he Government may act only as the Constitution authorizes, whether the actions in question are foreign or domestic"). In particular, the Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by

other immigration documents); § 2331 (terrorist acts abroad against United States nationals); 49 U. S. C. App. § 1472(n) (1982 ed. and Supp. V) (aircraft piracy outside the special aircraft jurisdiction of the United States, if the offender is found in the United States). Foreign nationals may also be criminally liable for numerous federal crimes falling within the "special maritime and territorial jurisdiction of the United States," which includes "[a]ny place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States." 18 U. S. C. § 7(7). Finally, broad construction of federal conspiracy statutes may permit prosecution of foreign nationals who have had no direct contact with anyone or anything in the United States. See *Ford* v. *United States*, 273 U. S. 593, 619–620 (1927).

Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Court today creates an antilogy: the Constitution authorizes our Government to enforce our criminal laws abroad, but when Government agents exercise this authority, the Fourth Amendment does not travel with them. This cannot be. At the very least, the Fourth Amendment is an unavoidable correlative of the Government's power to enforce the criminal law.

## A

The Fourth Amendment guarantees the right of "the people" to be free from unreasonable searches and seizures and provides that a warrant shall issue only upon presentation of an oath or affirmation demonstrating probable cause and particularly describing the place to be searched and the persons or things to be seized. According to the majority, the term "the people" refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Ante*, at 265. The Court admits that "the people" extends beyond the citizenry, but leaves the precise contours of its "sufficient connection" test unclear. At one point the majority hints that aliens are protected by the Fourth Amendment only when they come within the United States and develop "substantial connections" with our country. *Ante*, at 271. At other junctures, the Court suggests that an alien's presence in the United States must be voluntary[5] and that the alien must have "accepted some so-

---

[5] None of the cases cited by the majority, *ante*, at 271, requires an alien's connections to the United States to be "voluntary" before the alien can claim the benefits of the Constitution. Indeed, *Mathews* v. *Diaz*, 426 U. S. 67, 77 (1976), explicitly rejects the notion that an individual's connections to the United States must be voluntary or sustained to qualify for constitutional protection. Furthermore, even if a voluntariness requirement were sensible in cases guaranteeing certain governmental benefits to illegal aliens, *e. g.*, *Plyler* v. *Doe*, 457 U. S. 202 (1982) (holding

cietal obligations."[6]  *Ante*, at 273.  At yet other points, the majority implies that respondent would be protected by the Fourth Amendment if the place searched were in the United States.[7]  *Ante*, at 266, 274–275.

What the majority ignores, however, is the most obvious connection between Verdugo-Urquidez and the United States: he was investigated and is being prosecuted for violations of United States law and may well spend the rest of his life in a United States prison.  The "sufficient connection" is supplied not by Verdugo-Urquidez, but by the Government.

that States cannot deny to illegal aliens the free public education they provide to citizens and legally documented aliens), it is not a sensible requirement when our Government chooses to impose our criminal laws on others.

[6] In this discussion, the Court implicitly suggests that the Fourth Amendment may not protect illegal aliens in the United States.  *Ante*, at 273. Numerous lower courts, however, have held that illegal aliens in the United States are protected by the Fourth Amendment, and not a single lower court has held to the contrary.  See, *e. g.*, *Benitez-Mendez* v. *INS*, 760 F. 2d 907 (CA9 1985); *United States* v. *Rodriguez*, 532 F. 2d 834, 838 (CA2 1976); *Au Yi Lau* v. *INS*, 144 U. S. App. D. C. 147, 156, 445 F. 2d 217, 225, cert. denied, 404 U. S. 864 (1971); *Yam Sang Kwai* v. *INS*, 133 U. S. App. D. C. 369, 372, 411 F. 2d 683, 686, cert. denied, 396 U. S. 877 (1969).

[7] The Fourth Amendment contains no express or implied territorial limitations, and the majority does not hold that the Fourth Amendment is inapplicable to searches outside the United States and its territories.  It holds that respondent is not protected by the Fourth Amendment because he is not one of "the people."  Indeed, the majority's analysis implies that a foreign national who had "developed sufficient connection with this country to be considered part of [our] community" would be protected by the Fourth Amendment regardless of the location of the search.  Certainly nothing in the Court's opinion questions the validity of the rule, accepted by every Court of Appeals to have considered the question, that the Fourth Amendment applies to searches conducted by the United States Government against United States citizens abroad.  See, *e. g.*, *United States* v. *Conroy*, 589 F. 2d 1258, 1264 (CA5), cert. denied, 444 U. S. 831 (1979); *United States* v. *Rose*, 570 F. 2d 1358, 1362 (CA9 1978).  A warrantless, unreasonable search and seizure is no less a violation of the Fourth Amendment because it occurs in Mexicali, Mexico, rather than Calexico, California.

Respondent is entitled to the protections of the Fourth Amendment because our Government, by investigating him and attempting to hold him accountable under United States criminal laws, has treated him as a member of our community for purposes of enforcing our laws. He has become, quite literally, one of the governed. Fundamental fairness and the ideals underlying our Bill of Rights compel the conclusion that when we impose "societal obligations," *ante*, at 273, such as the obligation to comply with our criminal laws, on foreign nationals, we in turn are obliged to respect certain correlative rights, among them the Fourth Amendment.

By concluding that respondent is not one of "the people" protected by the Fourth Amendment, the majority disregards basic notions of mutuality. If we expect aliens to obey our laws, aliens should be able to expect that we will obey our Constitution when we investigate, prosecute, and punish them. We have recognized this fundamental principle of mutuality since the time of the Framers. James Madison, universally recognized as the primary architect of the Bill of Rights, emphasized the importance of mutuality when he spoke out against the Alien and Sedition Acts less than a decade after the adoption of the Fourth Amendment:

> "[I]t does not follow, because aliens are not parties to the Constitution, as citizens are parties to it, that, whilst they actually conform to it, they have no right to its protection. Aliens are not more parties to the laws than they are parties to the Constitution; yet it will not be disputed that, as they owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage." Madison's Report on the Virginia Resolutions (1800), reprinted in 4 Elliot's Debates 556 (2d ed. 1836).

Mutuality is essential to ensure the fundamental fairness that underlies our Bill of Rights. Foreign nationals investigated and prosecuted for alleged violations of United States criminal laws are just as vulnerable to oppressive Govern-

ment behavior as are United States citizens investigated and prosecuted for the same alleged violations. Indeed, in a case such as this where the Government claims the existence of an international criminal conspiracy, citizens and foreign nationals may be codefendants, charged under the same statutes for the same conduct and facing the same penalties if convicted. They may have been investigated by the same agents pursuant to the same enforcement authority. When our Government holds these codefendants to the same standards of conduct, the Fourth Amendment, which protects the citizen from unreasonable searches and seizures, should protect the foreign national as well.

Mutuality also serves to inculcate the values of law and order. By respecting the rights of foreign nationals, we encourage other nations to respect the rights of our citizens. Moreover, as our Nation becomes increasingly concerned about the domestic effects of international crime, we cannot forget that the behavior of our law enforcement agents abroad sends a powerful message about the rule of law to individuals everywhere. As Justice Brandeis warned in *Olmstead* v. *United States*, 277 U. S. 438 (1928):

> "If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means . . . would bring terrible retribution. Against that pernicious doctrine, this Court should resolutely set its face." *Id.*, at 485 (dissenting opinion).

This principle is no different when the United States applies its rules of conduct to foreign nationals. If we seek respect for law and order, we must observe these principles ourselves. Lawlessness breeds lawlessness.

Finally, when United States agents conduct unreasonable searches, whether at home or abroad, they disregard our Nation's values. For over 200 years, our country has considered itself the world's foremost protector of liberties. The

privacy and sanctity of the home have been primary tenets of our moral, philosophical, and judicial beliefs.[8]  Our national interest is defined by those values and by the need to preserve our own just institutions.  We take pride in our commitment to a Government that cannot, on mere whim, break down doors and invade the most personal of places.  We exhort other nations to follow our example.  How can we explain to others — and to ourselves — that these long cherished ideals are suddenly of no consequence when the door being broken belongs to a foreigner?

The majority today brushes aside the principles of mutuality and fundamental fairness that are central to our Nation's constitutional conscience.  The Court articulates a "sufficient connection" test but then refuses to discuss the underlying principles upon which any interpretation of that test must rest.  I believe that by placing respondent among those governed by federal criminal laws and investigating him for violations of those laws, the Government has made him a part of our community for purposes of the Fourth Amendment.

## B

In its effort to establish that respondent does not have sufficient connection to the United States to be considered one of "the people" protected by the Fourth Amendment, the Court relies on the text of the Amendment, historical evidence, and cases refusing to apply certain constitutional provisions outside the United States.  None of these, however, justifies the majority's cramped interpretation of the Fourth Amendment's applicability.

---

[8] President John Adams traced the origins of our independence from England to James Otis' impassioned argument in 1761 against the British writs of assistance, which allowed revenue officers to search American homes wherever and whenever they wanted.  Otis argued that "[a] man's house is his castle," 2 Works of John Adams 524 (C. Adams ed. 1850), and Adams declared that "[t]hen and there the child Independence was born." 10 Works of John Adams 248 (C. Adams ed. 1856).

The majority looks to various constitutional provisions and suggests that " 'the people' seems to have been a term of art." *Ante*, at 265. But the majority admits that its "textual exegesis is by no means conclusive." *Ibid.*[9] One Member of the majority even states that he "cannot place any weight on the reference to 'the people' in the Fourth Amendment as a source of restricting its protections." *Ante*, at 276 (KENNEDY, J., concurring). The majority suggests a restrictive interpretation of those with "sufficient connection" to this country to be considered among "the people," but the term "the people" is better understood as a rhetorical counterpoint to "the Government," such that rights that were reserved to "the people" were to protect all those subject to "the Government." Cf. *New Jersey* v. *T. L. O.*, 469 U. S. 325, 335 (1985) ("[T]he Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'"). "The people" are "the governed."

In drafting both the Constitution and the Bill of Rights, the Framers strove to create a form of Government decidedly different from their British heritage. Whereas the British Parliament was unconstrained, the Framers intended to create a Government of limited powers. See B. Bailyn, The Ideological Origins of the American Revolution 182 (1967); 1 The Complete Anti-Federalist 65 (H. Storing ed. 1981). The colonists considered the British Government dangerously omnipotent. After all, the British declaration of rights in

---

[9] The majority places an unsupportable reliance on the fact that the Drafters used "the people" in the Fourth Amendment while using "person" and "accused" in the Fifth and Sixth Amendments respectively, see *ante*, at 265–266. The Drafters purposely did not use the term "accused." As the majority recognizes, *ante*, at 264, the Fourth Amendment is violated at the time of an unreasonable governmental intrusion, even if the victim of unreasonable governmental action is never formally "accused" of any wrongdoing. The majority's suggestion that the Drafters could have used "person" ignores the fact that the Fourth Amendment then would have begun quite awkwardly: "The right of persons to be secure in their persons . . . ."

1688 had been enacted not by the people, but by Parliament. The Federalist No. 84, p. 439 (M. Beloff ed. 1987). Americans vehemently attacked the notion that rights were matters of " 'favor and grace,' " given *to* the people *from* the Government. B. Bailyn, *supra*, at 187 (quoting John Dickinson).

Thus, the Framers of the Bill of Rights did not purport to "create" rights. Rather, they designed the Bill of Rights to prohibit our Government from infringing rights and liberties presumed to be pre-existing. See, *e. g.*, U. S. Const., Amdt. 9 ("The enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people"). The Fourth Amendment, for example, does not create a new right of security against unreasonable searches and seizures. It states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, *shall not be violated* . . . ." The focus of the Fourth Amendment is on *what* the Government can and cannot do, and *how* it may act, not on *against whom* these actions may be taken. Bestowing rights and delineating protected groups would have been inconsistent with the Drafters' fundamental conception of a Bill of Rights as a limitation on the Government's conduct with respect to all whom it seeks to govern. It is thus extremely unlikely that the Framers intended the narrow construction of the term "the people" presented today by the majority.

The drafting history of the Fourth Amendment also does not support the majority's interpretation of "the people." First, the Drafters chose not to limit the right against unreasonable searches and seizures in more specific ways. They could have limited the right to "citizens," "freemen," "residents," or "the American people." The conventions called to ratify the Constitution in New York and Virginia, for example, each recommended an amendment stating, "That every freeman has a right to be secure from all unreasonable searches and seizures . . . ." W. Cuddihy, Search and Sei-

zure in Great Britain and the American Colonies, pt. 2, p. 571, n. 129, 574, n. 134 (1974). But the Drafters of the Fourth Amendment rejected this limitation and instead provided broadly for "[t]he right of the people to be secure in their persons, houses, papers, and effects." Second, historical materials contain no evidence that the Drafters intended to limit the availability of the right expressed in the Fourth Amendment.[10] The Amendment was introduced on the floor of Congress, considered by Committee, debated by the House of Representatives and the Senate, and submitted to the 13 States for approval. Throughout that entire process, no speaker or commentator, pro or con, referred to the term "the people" as a limitation.

---

[10] The only historical evidence the majority sets forth in support of its restrictive interpretation of the Fourth Amendment involves the seizure of French vessels during an "undeclared war" with France in 1798 and 1799. Because opinions in two Supreme Court cases, *Little* v. *Barreme*, 2 Cranch 170 (1804), and *Talbot* v. *Seeman*, 1 Cranch 1 (1801), "never suggested that the Fourth Amendment restrained the authority of Congress or of United States agents to conduct operations such as this," *ante*, at 268, the majority deduces that those alive when the Fourth Amendment was adopted did not believe it protected foreign nationals. Relying on the *absence* of any discussion of the Fourth Amendment in these decisions, however, runs directly contrary to the majority's admonition that the Court only truly decides that which it "expressly address[es]." *Ante*, at 272 (discussing *INS* v. *Lopez-Mendoza*, 468 U. S. 1032 (1984)). Moreover, the Court in *Little* found that the American commander had violated the statute authorizing seizures, thus rendering any discussion of the constitutional question superfluous. See, *e. g.*, *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring). And in *Talbot*, the vessel's owners opposed the seizure on purely factual grounds, claiming the vessel was not French. Furthermore, although neither *Little* nor *Talbot* expressly mentions the Fourth Amendment, both opinions adopt a "probable cause" standard, suggesting that the Court may have either applied or been informed by the Fourth Amendment's standards of conduct. *Little*, *supra*, at 179; *Talbot*, *supra*, at 31–32 (declaring that "where there is probable cause to believe the vessel met with at sea is in the condition of one liable to capture, it is lawful to take her, and subject her to the examination and adjudication of the courts").

The Court also relies on a series of cases dealing with the application of criminal procedural protections outside of the United States to conclude that "not every constitutional provision applies to governmental activity even where the United States has sovereign power." *Ante*, at 268. None of these cases, however, purports to read the phrase "the people" as limiting the protections of the Fourth Amendment to those with "sufficient connection" to the United States, and thus none gives content to the majority's analysis. The cases shed no light on the question whether respondent—a citizen of a nonenemy nation being tried in a United States federal court—is one of "the people" protected by the Fourth Amendment.

The majority mischaracterizes *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950), as having "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *Ante*, at 269. In *Johnson*, 21 German nationals were convicted of engaging in continued military activity against the United States after the surrender of Germany and before the surrender of Japan in World War II. The Court held that "the Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an *alien enemy* engaged in the hostile service of a government at war with the United States." 339 U. S., at 785 (emphasis added). As the Court wrote:

> "It is war that exposes the relative vulnerability of the alien's status. The security and protection enjoyed while the nation of his allegiance remains in amity with the United States are greatly impaired when his nation takes up arms against us. . . . But disabilities this country lays upon the alien who becomes also an enemy are imposed temporarily as an incident of war and not as an incident of alienage." *Id.*, at 771–772.

The Court rejected the German nationals' efforts to obtain writs of habeas corpus not because they were foreign nationals, but because they were enemy soldiers.

The *Insular Cases, Balzac* v. *Porto Rico,* 258 U. S. 298 (1922), *Ocampo* v. *United States,* 234 U. S. 91 (1914), *Dorr* v. *United States,* 195 U. S. 138 (1904), and *Hawaii* v. *Mankichi,* 190 U. S. 197 (1903), are likewise inapposite. The *Insular Cases* all concerned whether accused persons enjoyed the protections of certain rights in criminal prosecutions brought by territorial authorities in territorial courts. These cases were limited to their facts long ago, see *Reid* v. *Covert,* 354 U. S., at 14 (plurality opinion) ("[I]t is our judgment that neither the cases nor their reasoning should be given any further expansion"), and they are of no analytical value when a criminal defendant seeks to invoke the Fourth Amendment in a prosecution by the Federal Government in a federal court.[11]

C

The majority's rejection of respondent's claim to Fourth Amendment protection is apparently motivated by its fear that application of the Amendment to law enforcement searches against foreign nationals overseas "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest." *Ante,* at 273–274. The majority's doomsday scenario—that American Armed Forces conducting a mission to protect our national security with no law enforcement objective "would have to articulate specific facts giving them probable cause to undertake a search or seizure," *ante,* at 274—is fanciful. Verdugo-Urquidez is protected by the Fourth Amendment

---

[11] The last of the *Insular Cases* cited by the majority, *Downes* v. *Bidwell,* 182 U. S. 244 (1901), is equally irrelevant. In *Downes,* the Court held that Puerto Rico was not part of "the United States" with respect to the constitutional provision that "all Duties, Imposts and Excises shall be uniform throughout the United States," U. S. Const., Art. I, § 8, cl. 1. 182 U. S., at 249. Unlike the Uniform Duties Clause, the Fourth Amendment contains no express territorial limitations. See n. 7, *supra.*

because our Government, by investigating and prosecuting him, has made him one of "the governed." See *supra*, at 284, 287. Accepting respondent as one of "the governed," however, hardly requires the Court to accept enemy aliens in wartime as among "the governed" entitled to invoke the protection of the Fourth Amendment. See *Johnson* v. *Eisentrager, supra.*

Moreover, with respect to non-law-enforcement activities not directed against enemy aliens in wartime but nevertheless implicating national security, doctrinal exceptions to the general requirements of a warrant and probable cause likely would be applicable more frequently abroad, thus lessening the purported tension between the Fourth Amendment's strictures and the Executive's foreign affairs power. Many situations involving sensitive operations abroad likely would involve exigent circumstances such that the warrant requirement would be excused. Cf. *Warden* v. *Hayden*, 387 U. S. 294, 298 (1967). Therefore, the Government's conduct would be assessed only under the reasonableness standard, the application of which depends on context. See *United States* v. *Montoya de Hernandez*, 473 U. S. 531, 537 (1985) ("What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself").

In addition, where the precise contours of a "reasonable" search and seizure are unclear, the Executive Branch will not be "plunge[d] . . . into a sea of uncertainty," *ante*, at 274, that will impair materially its ability to conduct foreign affairs. Doctrines such as official immunity have long protected Government agents from any undue chill on the exercise of lawful discretion. See, *e. g., Butz* v. *Economou*, 438 U. S. 478 (1978). Similarly, the Court has recognized that there may be certain situations in which the offensive use of constitutional rights should be limited. Cf. *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 396 (1971) (precluding suits for damages for violations of the Fourth Amendment where there are "special factors

counselling hesitation"). In most cases implicating foreign policy concerns in which the reasonableness of an overseas search or seizure is unclear, application of the Fourth Amendment will not interfere with the Executive's traditional prerogative in foreign affairs because a court will have occasion to decide the constitutionality of such a search only if *the Executive* decides to bring a criminal prosecution and introduce evidence seized abroad. When the Executive decides to conduct a search as part of an ongoing criminal investigation, fails to get a warrant, and then seeks to introduce the fruits of that search at trial, however, the courts must enforce the Constitution.

## II

Because the Fourth Amendment governs the search of respondent's Mexican residences, the District Court properly suppressed the evidence found in that search because the officers conducting the search did not obtain a warrant.[12] I cannot agree with JUSTICE BLACKMUN and JUSTICE STEVENS that the Warrant Clause has no application to searches

---

[12] The District Court found no exigent circumstances that would justify a warrantless search. After respondent's arrest in Mexico, he was transported to the United States and held in custody in southern California. Only after respondent was in custody in the United States did the Drug Enforcement Administration (DEA) begin preparations for a search of his Mexican residences. On the night respondent was arrested, DEA Agent Terry Bowen contacted DEA Special Agent Walter White in Mexico to seek his assistance in conducting the search. Special Agent White contacted Mexican officials the next morning and at 1 p.m. authorized Agent Bowen to conduct the search. A team of DEA agents then drove to Mexico, met with Mexican officials, and arrived at the first of respondent's two residences after dark. 856 F. 2d 1214, 1226 (CA9 1988). The search did not begin until approximately 10 p.m. the day after respondent was taken into custody. App. to Pet. for Cert. 101a. In all that time, particularly when respondent and Agent Bowen were both in the United States and Agent Bowen was awaiting further communications from Special Agent White, DEA agents could easily have sought a warrant from a United States Magistrate.

of noncitizens' homes in foreign jurisdictions because American magistrates lack the power to authorize such searches.[13] See *post,* at 297 (BLACKMUN, J., dissenting); *ante,* at 279 (STEVENS, J., concurring in judgment). The Warrant Clause would serve the same primary functions abroad as it does domestically, and I see no reason to distinguish between foreign and domestic searches.

The primary purpose of the warrant requirement is its assurance of neutrality. As Justice Jackson stated for

---

[13] JUSTICE STEVENS concurs in the judgment because he believes that the search in this case "was not 'unreasonable' as that term is used in the first Clause of the Amendment." *Ante,* at 279. I do not understand why JUSTICE STEVENS reaches the reasonableness question in the first instance rather than remanding that issue to the Court of Appeals.  The District Court found that, even if a warrant were not required for this search, the search was nevertheless unreasonable. The court found that the search was unconstitutionally general in its scope, as the agents were not limited by any precise written or oral descriptions of the type of documentary evidence sought. App. to Pet. for Cert. 102a. Furthermore, the Government demonstrated no specific exigent circumstances that would justify the increased intrusiveness of searching respondent's residences between 10 p.m. and 4 a.m., rather than during the day. *Id.,* at 101a. Finally, the DEA agents who conducted the search did not prepare contemporaneous inventories of the items seized or leave receipts to inform the residents of the search and the items seized. *Id.,* at 102a. Because the Court of Appeals found that the search violated the Warrant Clause, it never reviewed the District Court's alternative holding that the search was unreasonable even if no warrant were required. Thus, even if I agreed with JUSTICE STEVENS that the Warrant Clause did not apply in this case, I would remand to the Court of Appeals for consideration of whether the search was unreasonable. Barring a detailed review of the record, I think it is inappropriate to draw any conclusion about the reasonableness of the Government's conduct, particularly when the conclusion reached contradicts the specific findings of the District Court.

JUSTICE KENNEDY rejects application of the Warrant Clause not because of the identity of the individual seeking protection, but because of the location of the search. See *ante,* at 278 (concurring opinion) ("[T]he Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country"). JUSTICE KENNEDY, however, never explains why the Reasonableness Clause, as opposed to the Warrant Clause, would not apply to searches abroad.

the Court in *Johnson* v. *United States*, 333 U. S. 10, 13–14 (1948) (footnotes omitted):

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

See also *Welsh* v. *Wisconsin*, 466 U. S. 740, 748–749, and n. 10 (1984); *Coolidge* v. *New Hampshire*, 403 U. S. 443, 449 (1971). A warrant also defines the scope of a search and limits the discretion of the inspecting officers. See *New York* v. *Burger*, 482 U. S. 691, 703 (1987); *Marron* v. *United States*, 275 U. S. 192, 196 (1927). These purposes would be served no less in the foreign than in the domestic context.

The Warrant Clause cannot be ignored simply because Congress has not given any United States magistrate authority to issue search warrants for foreign searches. See Fed. Rule Crim. Proc. 41(a). Congress cannot define the contours of the Constitution. If the Warrant Clause applies, Congress cannot excise the Clause from the Constitution by failing to provide a means for United States agents to obtain a warrant. See *Best* v. *United States*, 184 F. 2d 131, 138 (CA1 1950) ("Obviously, Congress may not nullify the guarantees of the Fourth Amendment by the simple expedient of

not empowering any judicial officer to act on an application for a warrant"), cert. denied, 340 U. S. 939 (1951).

Nor is the Warrant Clause inapplicable merely because a warrant from a United States magistrate could not "authorize" a search in a foreign country. Although this may be true as a matter of international law, it is irrelevant to our interpretation of the Fourth Amendment. As a matter of United States constitutional law, a warrant serves the same primary function overseas as it does domestically: it assures that a neutral magistrate has authorized the search and limited its scope. The need to protect those suspected of criminal activity from the unbridled discretion of investigating officers is no less important abroad than at home.[14]

## III

When our Government conducts a law enforcement search against a foreign national outside of the United States and its territories, it must comply with the Fourth Amendment. Absent exigent circumstances or consent, it must obtain a

---

[14] The United States Government has already recognized the importance of these constitutional requirements by adopting a warrant requirement for certain foreign searches. Department of the Army regulations state that the Army must seek a "judicial warrant" from a United States court whenever the Army seeks to intercept the wire or oral communications of a person not subject to the Uniform Code of Military Justice outside of the United States and its territories. Army Regulation 190–53 ¶ 2–2(b) (1986). Any request for a judicial warrant must be supported by sufficient facts to meet the probable-cause standard applied to interceptions of wire or oral communications in the United States, 18 U. S. C. § 2518(3). Army Regulation 190–53 ¶ 2–2(b). If the foreign country in which the interception will occur has certain requirements that must be met before other nations can intercept wire or oral communications, an American judicial warrant will not alone authorize the interception under international law. Nevertheless, the Army has recognized that an order from a United States court is necessary under domestic law. By its own regulations, the United States Government has conceded that although an American warrant might be a "dead letter" in a foreign country, a warrant procedure in an American court plays a vital and indispensable role in circumscribing the discretion of agents of the Federal Government.

search warrant from a United States court. When we tell the world that we expect all people, wherever they may be, to abide by our laws, we cannot in the same breath tell the world that our law enforcement officers need not do the same. Because we cannot expect others to respect our laws until we respect our Constitution, I respectfully dissent.

JUSTICE BLACKMUN, dissenting.

I cannot accept the Court of Appeals' conclusion, echoed in some portions of JUSTICE BRENNAN's dissent, that the Fourth Amendment governs every action by an American official that can be characterized as a search or seizure. American agents acting abroad generally do not purport to exercise *sovereign* authority over the foreign nationals with whom they come in contact. The relationship between these agents and foreign nationals is therefore fundamentally different from the relationship between United States officials and individuals residing within this country.

I am inclined to agree with JUSTICE BRENNAN, however, that when a foreign national is held accountable for purported violations of United States criminal laws, he has effectively been treated as one of "the governed" and therefore is entitled to Fourth Amendment protections. Although the Government's exercise of *power* abroad does not ordinarily implicate the Fourth Amendment, the enforcement of domestic criminal law seems to me to be the paradigmatic exercise of sovereignty over those who are compelled to obey. In any event, as JUSTICE STEVENS notes, *ante*, at 279, respondent was lawfully (though involuntarily) within this country at the time the search occurred. Under these circumstances I believe that respondent is entitled to invoke protections of the Fourth Amendment. I agree with the Government, however, that an American magistrate's lack of power to authorize a search abroad renders the Warrant Clause inapplicable to the search of a noncitizen's residence outside this country.

The Fourth Amendment nevertheless requires that the search be "reasonable." And when the purpose of a search is

the procurement of evidence for a criminal prosecution, we have consistently held that the search, to be reasonable, must be based upon probable cause. Neither the District Court nor the Court of Appeals addressed the issue of probable cause, and I do not believe that a reliable determination could be made on the basis of the record before us. I therefore would vacate the judgment of the Court of Appeals and remand the case for further proceedings.