TORRUELLA, Circuit Judge
(Concurring).
As I did in Igartua I, I join the Court’s opinion in this appeal because I believe it to be technically and, as the law now stands, legally correct in its conclusion that the Constitution does not guarantee United States citizens residing in Puerto Rico the right to vote in the national Presidential election. I also agree with the Court’s indication that today’s decision expresses no opinion with regard to the validity under Puerto Rico law of Law 403 of September 10, 2000, which is the subject of separate litigation and which I conclude is not properly before us. I am, however, compelled to write separately because I can no longer remain silent to the subja-cent question, because from my perspective, there are larger issues at stake.
I.
More than 100 years ago, at the conclusion of the Spanish-American War of 1898, Puerto Rico was ceded to the United States by Spain.[2] Despite lofty rhetoric at the time extolling the virtues of American democracy, It should be noted that, at the time of General Miles’ arrival, and since the enactment of the Spanish Constitution of 1812, Puerto Ricans enjoyed Spanish citizenship and voting representation in the Spanish Parliament, rights which were confirmed in the Constitution of 1876 and in the Autonomic Charter of 1897. 1 José Trías Monge, Historia Constitucional de Puerto Rico 34-35 (1983).[3] the United States has since exercised almost unfettered power over Puerto Rico and the nearly 4,000,000 United States citizens who currently reside there.[4] Although persons *86 born in Puerto Rico are citizens of the United States at birth,[5] and thereby “owe[] allegiance to the United States,” Kawakita v. United States, 343 U.S. 717, 736, 72 S.Ct. 950, 96 L.Ed. 1249 (1952), while residing in Puerto Rico they enjoy fewer rights than citizens of the United States that reside in the fifty States, see United States v. Verdugo-Urquídez, 494 U.S. 259, 268, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (and cases cited therein), or even in foreign countries, see Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). Undoubtedly the most glaring evidence of this egregious disparity is the fact that they do not elect a single voting representative[6] to a federal government that exercises almost absolute power over them.
This anomalous situation arises primarily as a result of the decisions of the Supreme Court in the Insular Cases,[7] which established as early as 1901 the plenary power of Congress over Puerto Rico under the so-called “territorial” clause of the Constitution.[8] In a series of narrowly divided decisions, the Court held that Puerto Rico was an “unincorporated territory,” see Insular Cases, supra note 6, and as a result part of the United States for some purposes[9] and not for others.[10] As such, Congress was held to have plenary power over the internal and external affairs of the Island, subject not even to the Bill of Rights except insofar as those guarantees might be explicitly extended to the Island by Congress. See Downes, 182 U.S. at 286, 21 S.Ct. 770.
■ Between 1898 and 1917, persons residing in Puerto Rico were considered to be citizens of Puerto Rico [11] and “nationals” of the United States.[12] This condition was changed in 1917, however, when Congress granted United States citizenship en masse to the residents of Puerto Rico.[13] *87 Notwithstanding this apparent upgrading of the personal status of Puerto Rico’s residents, the Supreme Court in 1922 in Balzac v. Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922), established the inferior nature of the United States citizenship held by residents of Puerto Rico by concluding that the Constitution’s protection of these new citizens was limited to those rights deemed by the Court to be “fundamental.”[14] Cf. Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (voting is “a fundamental political right, because [it is] preservative of all rights”); see also Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).
II.
Since Balzac the civil rights of United States citizens residing in Puerto Rico, particularly their national political rights, have remained dormant at best, subject to the vagaries of Congress, and the conspicuous inattention of the judiciary. The granting of so-called “Commonwealth” status in 1952,[15] itself an enigmatic condition [16] which merely allowed the residents *88 of Puerto Rico limited self-government, did nothing to correct Puerto Rico’s fundamental condition of national unempowerment, embodied most notably in the lack of voting representation in the Congress and the ineligibility to vote for President and Vice-President. The United States citizens residing in Puerto Rico to this day continue to have no real say in the choice of those who, from afar, really govern them, nor as to the enactment, application, and administration of the myriad of federal laws and regulations that control almost every aspect of their daily affairs.
On numerous occasions since 1952 Congress has turned a blind eye and a deaf ear to the continuing inequality to which United States citizens in Puerto Rico are subjected, and a perusal of the Congressional Record demonstrates the jealousy with which Congress has guarded its plenary power over the Island.[17] The courts have supported this view. See Harris v. Rosario, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980); Califano v. Torres, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978).
This is not a totally unpredicted scenario. As far back as 1901, in the first of the Insular Cases, De Lima v. Bidwell, 182 U.S. at 196-97, 21 S.Ct. 743, the Court expressed its concern with the possibility that Congress might hold Puerto Rico in limbo indefinitely:
The theory that a country remains foreign with respect to the tariff laws until Congress has acted by embracing it within the Customs union, ... presupposes that territory may be held indefinitely by the United States; that it may be treated in every particular, except for tariff purposes, as domestic territory; that laws may be enacted and enforced by officers of the United States sent there for that purpose; that insurrections may be suppressed, wars carried on, revenues collected, taxes imposed; in short, that everything may be done which a government can do within its own boundaries, and yet that the territory may still remain a foreign country. That this state of things may continue for years, for a century even, but that until Congress enacts otherwise, it still remains a foreign country. To hold that this can be done as matter of law we deem to be pure judicial legislation. We find no warrant for it in the Constitution or in the powers conferred upon this court.... (Emphasis provided).
See also Downes, 182 U.S. at 379-80, 21 S.Ct. 770 (Harlan, J. dissenting).
The present conundrum cannot be justified or perpetuated further under the subterfuge of labeling it a “political question.” Undoubtedly, this situation is “political” in the sense that it involves the political rights of a substantial number of United States citizens. It is also “political” because it is one that should, in the normal course of things, be resolved by the political process and the political branches of government. But in the final analysis, this problem is no more “political” than that presented to and resolved by the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), one that required corrective judicial action even in the face of longstanding *89 legal precedent.[18] In Brown, the Court recognized that, as the ultimate interpreter and protector of the Constitution, it must at times fill the vacuum created by the failure or refusal of the political branches to protect the civil rights of a distinct and politically powerless group of United States citizens. See also United States v. Carolene Prods. Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (famously suggesting that “prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and ... may call for a correspondingly more searching judicial inquiry”).
The United States citizens residing in Puerto Rico are caught in an untenable Catch-22. The national disenfranchisement of these citizens ensures that they will never be able, through the political processes, to rectify the denial of their civil rights in those very political processes. This uninterrupted condition clearly provides solid basis for judicial intervention at some point, one for which there is resounding precedent. See Brown v. Board of Education, supra.
III.
In this 211th year of the United States Constitution, and 102nd year of United States presence in Puerto Rico, United States citizenship must mean more than merely the freedom to travel to and from the United States. See Balzac, 258 U.S. at 308, 42 S.Ct. 343. This citizenship should not, cannot, be devalued to such a low scale.
After more than a century of United States possession of Puerto Rico, there continues to be tremendous debate over the status of the Island and the nature of its relationship with the United States. Certainly the citizens of Puerto Rico are divided on the issue, a condition which has permitted the federal government to externalize this question. What is established, for the time being at least, is that the federal courts continue to recognize the almost absolute power of Congress to unilaterally dictate the affairs of Puerto Rico and her people. So long as that is the case, the practicality of the matter is that Puerto Rico remains a colony with little prospect of exerting effective political pressure on the elected branches of government to take corrective action.
■The contemporary society of United States citizens residing in Puerto Rico hardly deserves colonial treatment by the United States, assuming that such treatment is ever justified. Puerto Rico is home to a vibrant intellectual and cultural community which includes many institutions of higher education and other indicia of modern society, as well as a solid economic foundation which is wholly integrated into the National framework. Most importantly, its citizens have contributed in full measure, and at times beyond, to the defense of our Country.[19]
The perpetuation of this colonial condition runs against the very principles upon which this Nation was founded. Indefinite colonial rule by the United States is not something that was contemplated by the Founding Fathers nor authorized per sécu-la seculorum by the Constitution. See Downes, 182 U.S. at 380, 21 S.Ct. 770 (Harlan, J., dissenting) (“The idea that this *90 country may acquire territories anywhere upon the earth, by conquest or treaty, and hold them as mere colonies or provinces,— the people inhabiting them to enjoy only those rights as Congress chooses to accord to them, — is wholly inconsistent with the spirit and genius, as well as with the words, of the Constitution.”)- And far from being a matter of local concern to the United States citizens in Puerto Rico only, the inequality to which these citizens are subjected is an injury to every American, because as surely as the current situation causes irreparable harm to United States citizens residing in Puerto Rico, it just as powerfully denigrates the entire Nation and the Constitution.
Although this is not the case, nor perhaps the time, for a federal court to take remedial action to correct what is a patently intolerable situation, it is time to serve notice upon the political branches of government that it is incumbent upon them, in the first instance, to take appropriate steps to correct what amounts to an outrageous disregard for the rights of a substantial segment of its citizenry. A failure to do so countenances corrective judicial action. See Brown v. Board of Education, supra. It may be that the federal courts will be required to take extraordinary measures as necessary to protect discrete groups “completely under the sovereignty and dominion of the United States.” Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831) (Marshall, C.J.).
My concurrence in today’s decision, of course, indicates that I do not consider this the appropriate case for such intervention, largely because the particular issue of the presidential vote is governed by explicit language in the Constitution providing for the election of the President and Vice-President by the States, rather than by individual citizens. But I, for one, am of the view that my vote today is not equivalent to a carte blanche.

. See Treaty of Paris, Dec. 10, 1898, United States-Spain, 30 Stat. 1754. Article IX of the treaty reads: "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress.”

. For example, on July 28, 1898, three days after the landing of American troops at Guá-nica, General Nelson A. Miles, who commanded the expeditionary force, proclaimed:
In the prosecution of war against the kingdom of Spain by the people of the United States, in the cause of liberty, justice and humanity, its military forces have come to occupy the island of Porto Rico. They come bearing the banner of freedom, inspired by noble purposes,....
They bring you the fostering arms of a free people, whose greatest power is justice and humanity to all living within their fold....
They have come not to make war on the people of the country, who for centuries have been oppressed; but, on the contrary, to bring protection, not only to yourselves, but to your property, promote your prosperity and bestow the immunities and blessings of our enlightenment and liberal institutions and government....
Annual Report of the Major General Commanding the Army, Nelson A. Miles, Nov. 5, 1898, Messages, 1898-1899, at 31-32.
It should be noted that, at the time of General Miles' arrival, and since the enactment of the Spanish Constitution of 1812, Puerto Ri-cans enjoyed Spanish citizenship and voting representation in the Spanish Parliament, rights which were confirmed in the Constitution of 1876 and in the Autonomic Charter of 1897. See 1 José Trías Monge, Historia Constitucional de Puerto Rico, 34-35 (1983).

. See U.S. Census Bureau, Population Div., PR-99-1 Estimates of the Population of Puerto Rico Municipios, July 1, 1999, (July 21, 2000) <http://www.census.gov/population /www/estimates/puerto-rico.html>. This is a larger population than 26 of the States and more than the combined population of Maine, *86 New Hampshire, and Rhode Island, which together with Massachusetts and Puerto Rico constitute the First Circuit. See U.S. Census Bureau, Population Div., ST-99-3 State Population Estimates: Annual Time Series, (December 29, 1999) <http://www.census. gov/population/estimates/state/st-99-3 .txt>.

. 8 U.S.C. § 1402 (1999) (governing the citizenship of persons born in Puerto Rico on or after April 11, 1899). The residents of Puerto Rico were first granted citizenship in 1917. See Jones Act (Puerto Rico), § 5, ch. 145, 39 Stat. 951 (1917).

. The residents of Puerto Rico do elect a Resident Commissioner to represent their interests before Congress, but that official's lack of a vote obviously diminishes his ability to effectively represent them.

. Balzac v. Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); Ocampo v. United States, 234 U.S. 91, 34 S.Ct. 712, 58 L.Ed. 1231 (1914); Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); Hawaii v. Mankichi, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903); Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); Dooley v. United States, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); DeLima v. Bidwell, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901).

. Article 4, section 3, clause 2, of the Constitution states: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States...."

. See, e.g., De Lima, 182 U.S. 1, 200, 21 S.Ct. 743, 45 L.Ed. 1041 (1901) (Puerto Rico part of the United States for customs purposes).

. See, e.g., Downes, 182 U.S. 244, 287, 21 S.Ct. 770, 45 L.Ed. 1088 (1901) (”[T]he Island of Porto Rico is a territory appurtenanl and belonging to the United States, but not a part of the United States” for revenue purposes).

. See Foraker Act, § 7, 31 Stat. 77 (1900) (codified as amended at 48 U.S.C. § 733 (1987)).

. The term "national of the United States” is defined at 8 U.S.C. § 1101(a)(22) to mean "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States.” The only persons currently holding such status are residents of American Samoa and Swains Island.

. See Jones Act (Puerto Rico), § 5, ch. 145, 39 Stat. 951 (1917). This status was reiterated in the Nationality Act of 1940, § 202, ch. 876, 54 Stat. 1139 (1940), in which Congress explicitly stated that all persons born in Puer-to Rico automatically became citizens of the United States, a situation analogous to that existing within the then contiguous States under the Fourteenth Amendment. That provision was repealed by the Immigration and *87 Nationality Act of June 27, 1952, § 403, ch. 477, 66 Stat. 280, and replaced by the provision now codified at 8 U.S.C. § 1402 (1999) (governing the citizenship of all persons born in Puerto Rico on or after April 11, 1899).

. Balzac involved a claim to trial by jury in a criminal prosecution, which the Court concluded was unavailable in Puerto Rico,because trial by jury was not a "fundamental” right. Balzac, 258 U.S. at 312-13, 42 S.Ct. 343; cf. Duncan v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (holding that "trial by jury in criminal cases is fundamental to the American scheme of justice”). Balzac has never been reversed and has been cited approvingly by the Court as recently as 1990. See United States v. Verdugo-Urquídez, 494 U.S. 259, 268, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). In comparison, in Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), the Court refused to extend the reasoning of the Insular Cases to American civilians abroad who had been convicted by a court martial for a felony offense without being afforded the right to a jury trial. Justice Black, writing for a four-Justice plurality (no opinion of any Justices garnered a majority, and only eight Justices participated in the case), stated: "[I]n view of our heritage and the history of the adoption of the Constitution and the Bill of Rights, it seems peculiarly anomalous to say that trial before a civilian judge and by an independent jury picked from the common citizenry is not a fundamental right.” Justice Black went further, rejecting Balzac and the other Insular Cases as outdated, see id. at 14, 77 S.Ct. 1222, but concurring Justices Frankfurter and Harlan refused to go so far, see id. at 54, 66, 77 S.Ct. 1222. Ironically, because the holding of the Court extends the protection of United States citizenship to a proceeding that took place in England qua the condition of United States citizenship, this case seems to stand for the proposition that certain constitutional rights are inherent in United States citizenship.

. See Public Law 600, ch. 446, 64 Stat. 319 (1950) (codified at 48 U.S.C. § 731(b) (1994)).

. Even the term "Commonwealth,” as applied to Puerto Rico, is meaningless. Massachusetts, Pennsylvania, and Virginia are all entitled "commonwealths," yet Puerto Rico is certainly not equivalent to them as a political entity. Puerto Rico and the United States certainly do not form a "Commonwealth of Nations” nor is their relationship in anyway similar to that of the nations forming the "British Commonwealth.” In fact, the official title of "Commonwealth of Puerto Rico” is also officially in Spanish "Estado Libre Asociado,” which literally translated means "Free Associated State.” Puerto Rico is neither free nor a state, and as to being "associated” with the United States, the Supreme Court ruled long ago that "the Island of Porto Rico is a territory appurtenant and belonging to the United States, but not a part of the United States” for some purposes. Downes, 182 U.S. at 287, 21 S.Ct. 770 (Puerto Rico not part of the U.S. for revenue purposes). But see De Lima, 182 U.S. at 199-200, 21 S.Ct. 743 (Puerto Rico part of the U.S. for tariff purposes) (stating, ironically, "We are unable to acquiesce in this assumption that a territory may be at the same time both foreign and domestic”). The confusion does not end with the name, as the various courts, including of course the Supreme Court and our own, have contributed much to this condition. See Rodríguez v. Popular Democratic Party, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982); Harris v. Rosario, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980); Califano v. Torres, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 *88 (1978); Examining Bd. of Eng’rs v. Flores, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); Mercado v. Puerto Rico, 214 F.3d 34, 40, 44 (1st Cir.2000); Dávila-Pérez v. Lockheed Martin Corp., 202 F.3d 464 (1st Cir.2000); Romero v. United States, 38 F.3d 1204 (Fed.Cir.1994); United States v. Sanchez, 992 F.2d 1143 (11th Cir.1993); Trailer Marine Trans. Corp. v. Rivera Vázquez, 977 F.2d 1, 7 (1st Cir.1992); United States v. López Andino, 831 F.2d 1164 (1st Cir.1987); Córdova v. Simonpietri Ins. Agency v. Chase Manhattan Bank, 649 F.2d 36 (1st Cir.1981).

. See Hearings Before the House Comm, on Resources on H.R. 4751, 106th Cong., (Oct. 4, 2000); Young Bill, H.R. 856, 105th Cong. (1997); Fernós-Murray Bill, H.R. 5926, 86th Cong. (1959); Aspinall Bill, H.R. 5945, 88th Cong. (1963); Hearings Before House Sub-comm. on Territorial Affairs on H.R. 5945, 88th Cong. (1963).

. See Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).

. For example, more than 62,000 Puerto Ri-cans served in World War II. In Korea, over 43,000 Puerto Ricans served, including almost 40,000 volunteers, and approximately 3,540 of them lost their lives in defense of the United States, the second highest rale per capita of any jurisdiction in the Nation. Some 48,000 Puerto Ricans served in Vietnam; approximately 270 were killed and more than 3,000 wounded. Puerto Ricans also served in World War I and in every significant United States conflict since Vietnam, including the Persian Gulf War. See Lance Oliver, Puerto Rico's Overlooked Veterans, P.R. Herald (Nov. 11, 1999), available online at <http://www.puertorico-her ald.org>.