OPINION BY MOULTON, J.: Jerome Alvin Wilson appeals from the April 25, 2016 judgment of sentence entered in the Lycoming County Court of Common Pleas following his bench trial convictions for various drug-related offenses. We affirm. The trial court set forth the following factual history: On June 16, 2015, [Pennsylvania State Police (“PSP”) ] Trooper[s] [William] Havens and ... Robert Williamson were on duty and patrolling in an unmarked vehicle in Loyalsock Township[, Lycom-ing County], They were assigned to an “aggressive patrol” traveling - through specific areas of Loyalsock Township and Williamsport where “a lot of.drug activity was being reported by civilians.” Approximately a week .'earlier, Trooper Havens was speaking with-Trooper William Holmes regarding drug activity • in Loyalsock Township-in the area of the Kmart Plaza. Trooper Holmes provided Trooper Havens with at least one surveillance photo of a black male between 20 and 30 years old, who weighed approximately 220 pounds, had tattoos' on his left arm and was wearing bright red shoes. Trooper Holmes related to Trooper Havens that he observed the black male conduct what appeared to be at least five different drug transactions with unknown individuals in cars in the area. Trooper Holmes asked for Trooper Havens’ assistance in identifying the black male. At approximately 10:00 á,m. on June 16, 2015, while Troopers Havens and Williamson [ (“the Troopers”) ] were stationary near the area of the Best Western Hotel'in Loyalsóck Township across the street from the Kmart Plaza, they observed a passenger in a vehicle that passed in front of them. [The driver was later determined to be Wilson.] Both Trooper Williamson and Trooper Havens concluded that the passenger “looked a lot like the guy in the surveillance photo” provided by Trooper Holmes. This particular area was known as a “narcotics area.” In fact, the troopers were stationed in close proximity to the area where Trooper Holmes previously took the picture of the suspect. Trooper Havens and Trooper Williamson followed the vehicle around the hotel. The vehicle parked and the [T]roopers parked beside the vehicle. The passenger exited the vehicle. Trooper Havens immediately recognized the individual as the same individual in the surveillance photo “right down to the bright red shoes.” In fact, Trooper Holmes had nickname the unknown black male as “Dorothy” because of the shiny red shoes. Trooper Havens concluded as well that the suspect might have been wearing the same shorts as were depicted in the surveillance photo. The suspect exited the vehicle and quickly started walking away toward a breezeway. Trooper Havens exited his vehicle and called out for the suspect to stop. The [suspect] looked back, saw Trooper Havens who was in uniform, made eye contact with Trooper Havens[,] and walked away even faster. It was clear to Trooper Havens that the suspect wanted to get away. Por a short period of time, perhaps a few seconds, Trooper Havens lost sight of the suspect in the breezeway area. As a result, Trooper Havens jogged after the suspect, observed him at the end of the breezeway and called for him to stop a second time. The suspect continued walking away at a fast pace. Trooper Havens jogged faster and caught up with the suspect. Trooper Havens grabbed the,suspect’s arm. Immediately, the suspect tensed. Trooper Havens, based on his personal experience in the field for over two decades concluded that “a fight was coming.” For “pfficer safety,” Trooper Havens placed the suspect in handcuffs. The suspect was wearing a t-shirt and shorts. Trooper Havens was not concerned with the suspect having any weapons; he just did not want to get in a fight and be “rolling around on the floor.” Trooper Havens advised the suspect that he was not under arrest, just being detained. The suspect was escorted/walked back to the PSP vehicle. The walk back was approximately 30 to 40 feet. The suspect was identified as [Donald Lester Smith, Wilson’s co-defendant]. Regarding Wilson’s arrest on the alleged warrant, Trooper Havens testified that “almost simultaneously” with the Smith being brought back to the vehicle and then released from his handcuffs, identification information was obtained from Wilson. This identification information was radioed to a Police Communication Officer- (PCO) employed by the PSP. After inputting the information into the national database known as NCIC, the PCO informed Trooper Havens that Wilson was “wanted” on a warrant out of Philadelphia. Wilson was immediately placed in handcuffs and detained on the warrant. Shortly thereafter, the PCO communicated to the alleged issuing warrant authority that Wilson was in custody. It was requested that the warrant be confirmed and that instructions with respect to extradition be provided. While the warrant was being confirmed, the [T]roopers were continuing their investigation. Wilson was searched, but nothing was found on him. As Wilson was being handcuffed, Trooper Havens asked Smith if he had any weapons on him. Smith advised that he did not, but stated that he had “a little personal use heroin in his pocket.” Smith directed Trooper Havens to his front right cargo shorts pocket where Trooper Havens discovered 22 bags of suspected heroin in bundled amounts. Trooper Havens also discovered a cigar wrapper with four bags of suspected heroin, $536.00, and two cellular phones in other areas on Smith’s person. As a result of the heroin and paraphernalia in his possession, Smith was taken into custody. Smith was advised of his Miranda[1] rights and agreed to speak with Trooper Havens. He stated that he was a heroin user and that the heroin found on him was for personal use. He also indicated that there was additional heroin inside Room 123 of the Best Western Hotel, in which “they” (meaning him and Wilson) were staying. As well, a check with hotel staff revealed that Room 123 was rented on the previous date by Wilson. The heroin found on Smith field tested positive. Both Wilson and Smith were transported in handcuffs from the scene to the State Police Barracks. Wilson was initially handcuffed to a bench before being taken to an interview room for further questioning. Meanwhile, Trooper Havens prepared an affidavit of probable cause and an application for a search warrant. The search warrant was [authorized at 12 noon and] executed shortly after it was authorized.] In Room 123, the [T]roopers found an additional 136 bags of heroin, $359.00 in cash, two scales, a pill bottle containing marijuana and different size clothing of the approximate sizes of Wilson and Smith. ... At approximately 10:26 a.m., an hour and a half prior to authorization of the search warrant, the Philadelphia Police Department responded to the request by the PSP PCO for the warrant confirmation and extradition directions. The response indicated that there were no active warrants in the file and to not detain Wilson on the warrant. Trooper Havens testified that he was not aware of this information from Philadelphia until well after the preliminary hearing on July 6, 2015. While at the barracks, Wilson was read his Miranda rights and agreed to speak with the troopers. He admitted to receiving $200.00 from Smith for the purpose of driving Smith around to sell heroin. Further, he agreed to cooperate with law enforcement in both state and federal investigations and to act as a confidential informant. The interview of Wilson occurred as stated after he was read his rights, agreed to waive his rights and after the execution of the search warrant. Trooper Havens testified that regardless of the validity of the warrant, Wilson would have remained detained because of the drug investigation. Trooper Havens testified that the “warrant had nothing to do with it” and that once the drugs were found on Smith, both Wilson and Smith were being detained at the very least on reasonable suspicion that they were engaging in illegal drug trafficking. Trial Ct. Op., 1/26/16, at 5-9 (citations omitted). On July 31, 2015, Wilson was charged with two counts of possession of a controlled substance, two counts of possession with intent to deliver a controlled substance (“PWID”), possession of a small amount of marijuana for personal use, possession of drug paraphernalia, and criminal conspiracy to commit PWID.[2] On September 23, 2015, Wilson filed a petition for a writ of habeas corpus, arguing a lack of probable cause for his arrest. On October 28, 2015, the trial court held a hearing on the petition. At the habeas hearing, Wilson orally raised a suppression issue, and the trial court ordered Wilson to file a motion to suppress-no later than November 11, 2015. Wilson filed his suppression motion on November 12, 2015,[3] and the trial court held a suppression hearing on December 29, 2015. On November 13, 2015,- the trial court denied Wilson’s habeas petition; and on January 26, 2016, it denied Wilson’s suppression motion. On April 25, 2016, Wilson waived his right to a jury trial and proceeded to a bench trial (with co-defendant Smith) on stipulated facts, after which the trial court convicted him of the aforementioned offenses. That same day, the trial Court sentenced Wilson to an aggregate term of 4 to 10 years’ incarceration. On April 29, 2016, Wilson filed a post>sentence motion, which the trial court denied on May-27, 2016. On June 14, 2016, Wilson timely filed a notice of appeal. Wilson raises thrée issues on appeal: 1. Whether the court erred when it denied [Wilsonj’s [petition for a writ of habeas corpus] for the reason that the evidence presented did not establish probable cause to arrest [Wilson] for suspicion on the drug offense because at the time of the arrest, the officer had never seen or spoken to [Wilson] or did officer have any other information to connect [Wilson] to the crime. 2. Whether the court erred in not suppressing evidence offered by the Commonwealth because it was a result of an illegal search which occurred incident to a wrongful arrest. 3. Whether , the verdict was against the weight of the evidence because the court erred ip not suppressing the evidence obtained as a result of [Wilson]’s wrongful arrest and illegal search. Wilson’s Br. at 6. First, Wilson argues that “the Commonwealth did not articulate sufficient evidence to establish probable cause for the arrest of [Wilson] and, therefore, the Commonwealth failed to meet the burden of a prima facie case. Accordingly, because a prima facie case was not established for all charges, the trial court erroneously denied [Wilson’s] Petition for a writ of habe-as corpus.” Wilson’s Br. at 11. This argument appears to conflate two distinct claims — that the Commonwealth failed to establish a prima facie case, and that it lacked probable cause to arrest Wilson. First, it is well settled that when, at trial, the Commonwealth proves the offense beyond a reasonable doubt, any defects “at a preliminary hearing regarding the. sufficiency of the evidence are considered harmless.” Commonwealth v. Richer, 120 A.3d 349, 353 (Pa.Super. 2015). Thus, because he was convicted, Wilson cannot now challénge the trial court’s pre-trial denial of his claim that the Commonwealth had failed to present a prima facie case. Second, Wilson’s argument-thatthe trial court erred in dismissing his habeas petition because the Commonwealth failed to establish probable cause for his arrest is misplaced. As noted above, Wilson’s conviction at trial precludes this Court from reviewing his pretrial habeas issues. Next, Wilson argues that the trial court erred in denying his motion to suppress his statements made to the Troopers.[4] Wilson contends that he was illegally arrested on a faulty warrant and his statements to the Troopers should be excluded because the Troopers exploited the arrest to secure those statements. Wilson asserts that even though he was read his Miranda warnings, “all statements made following Miranda were not voluntary and ‘free of any element of coerciveness due to the unlawful- arrest’ and should be suppressed.” Wilson’s Br. at 16 (quoting Commonwealth v. Smith, 606 Pa. 127, 995 A.2d 1143, 1153 (2010)). While evidence obtained as a result of an unlawful arrest is generally inadmissible at trial, see Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), “not all confessions or admission secured from an illegally arrested person are per se inadmissible as trial evidence,” Commonwealth v. Smith, 995 A.2d at 1153 (Pa. 2010). Rather, we determine the admissibility of such statements on a case-by-case basis by examining the facts in light of the following factors: (1) whether Miranda warnings were given; (2) the “temporal proximity of the arrest and the confession”; (3) “the presence of intervening circumstances”; "and, (4) “the purpose and flagrancy óf the official misconduct.” The voluntariness of the statement is, of course, a threshold requirement, and the confession must also be “free of any element of coerciveness due to the unlawful arrest.” Commonwealth v. McFeely, 509 Pa. 394, 502 A.2d 167, 170 (1985) (quoting Commonwealth v. Bogan, 482 Pa. 151, 393 A.2d 424 (1978)). In McFeely, our Supreme Court considered a confession made after McFeely was arrested for murder. On appeal, McFeely argued that he had been illegally arrested without a warrant and, as a result, his statements should have been suppressed as fruit of the poisonous tree. Id. at 170. Our Supreme Court concluded that even had McFeely’s arrest been unlawful,[5] his subsequent statements were properly admitted: The suppression record supports the determination, that McFeely was given Miranda warnings, and that his confession did not occur immediately upon arrest, but rather was the product of the intervening circumstances of being confronted with the suspected murder weapon and his co-conspirator, who told him, ‘You’re the one that shot him and I told the police the truth and you tell the police the truth.” There is no claim that the confession was involuntary or that it was coerced due to the arrest. .Moreover, there is no element of police overreacting in the case: the police failed to secure an arrest warrant because they believed — correctly-r—that- the current law did not require one. Thus, the Commonwealth has met its burden of showing that the .connection between the warrantless arrest and the subsequent confession was “so. attenuated as to dissipate the taint, Wong Sun, 371 U.S. at 491, 83 S.Ct. 407, ... and thus, that.the confession was admissible. Id. at 170-71. Other decisions of our Supreme Court have acknowledged that the presence of.intervening circumstances may attenuate the connection between the illegal arrest and the confession such that it dissipates the taint. See, e.g., Commonwealth v. Shaw, 494 Pa. 364, 431 A.2d 897, 901 (1981) (concluding that confession was admissible despite illegal' arrest where “the single apparent motivation for [the co-defendant’s] confession^ which was introduced against appellant], was appellant’s confession implicating him”). Our Supreme Court’s more recent decision in Smith is also instructive. In Smith, while the appellant was a suspect in a murder, police executed an unrelated arrest warrant on the appellant. Unbeknownst to the arresting officer, that warrant had been served on the appellant nearly two months earlier but “was mistakenly deft in the active warrant bin.” 995 A.2d at 1151. The Court stated: Upon arriving at the police, station, appellant was given Miranda warnings and signed a waiver form. He gave police a statement indicating he met the victim the evening of the murder, but parted ways with her when her friend would not allow them inside her home. When police informed appellant they had information that he was later seen with the victim in William’s car, appellant invoked his right to remain silent and requested counsel. Police placed him in a holding cell based on- the inactive assault warrant, which they did not learn was invalid until the following day. Four hours later, a detective informed appellant he was being arrested and charged with the victim’s murder. As the detective was walking away, appellant told him he wanted .to talk, so the detective again gave him Miranda warnings and appellant signed another, waiver form. Appellant began to relay the derails of the murder to the detective; the detective paused to obtain a tape-recorder and gave appellant a third Miranda warning. Appellant again waived his rights and gave an incriminating.tape-recorded statement, admitting he killed the victim. Id. at 1151-1152. The Smith Court, concluded that while the appellant’s arrest was clearly illegal, suppression was not an appropriate remedy, nothing that the: ' police did not intend to use the . expired warrant to effectuate appellant’s arrest for the instant crime; rather, due to an administrative error, they mistakenly believed the.warrant was still,outstanding. The police lieutenant working on the murder investigation testified it was departmental practice to check the warrant bin — a file cabinet containing active arrest warrants — for outstanding warrants for persons whose residences they were going to search. Once an arrest warrant has been executed, it should be removed from the bin; however, there were procedural problems which did not always make such removal immediately possible. Thus, the warrant under which appellant was arrested, although invalid, was not fabricated to secure appellant’s arrest in order to coerce his confession. Accordingly, appellant’s confession was voluntarily given and was admissible at trial. Id. at 1152-53. We agree with Wilson and the trial court that, based on the record below, Wilson’s initial arrest was illegal because it was 'based on a non-existent warrant, see Commonwealth v. Johnson, 624 Pa. 325, 86 A.3d 182, 187 (2014). We also conclude that, at the time of the initial seizure in the parking lot, the Troopers appeared to lack probable cause to arrest Wilson.[6] Nevertheless, as in McFeely and Smith, we conclude that Wilson’s statements were sufficiently attenuated from the initial arrest that suppression would not be an appropriate remedy. The Troopers not only received information from Wilson’s co-defendant that the shared hotel room con-tamed more heroin, but also executed a search warrant on that room, which was in Wilson’s name, and recovered drugs, cash, drug paraphernalia, cell phones, and clothing belonging to both Wilson and Smith. N.T., 12/29/15, at 31-32. After executing the search warrant, the Troopers read Wilson his Miranda rights. Wilson waived those rights and confessed to transporting Smith to heroin deals in exchange for $200.00. Id. at 33. Much like McFeely, Wilson’s statements were not occasioned by the illegal arrest, but rather by his co-defendant’s statements and the evidence recovered in the hotel room. At this point, the Troopers clearly had probable cause to believe Wilson had committed PWID and conspiracy, and would have been able to arrest and interrogate Wilson. The discovery of this evidence, like the gun and statement from the co-defendant in McFeely, along with the Miranda warnings and Wilson’s waiver, constituted intervening circumstances that purged any taint from the illegal arrest. See also Wong Sun, 371 U.S. at 477-78, 83 S.Ct. 407. Nor is there any suggestion that the Troopers sought to exploit the purported, unrelated arrest warrant in order to secure a confession in this case.[7] The Troopers did not approach Wilson for questioning until after they had executed the search warrant on the hotel room, roughly three hours after the initial arrest. Nor does the record suggest that Wilson’s incriminating statements were in any way involuntary. In short, while the Troopers may have illegally held Wilson for a brief period, this illegal detention does not warrant suppression. Finally, Wilson argues that the verdict was against the weight of evidence. According to Wilson, had the trial court suppressed both the physical evidence obtained from the search warrant and Wilson’s statements, only Smith’s statements and the evidence recovered from Smith would be admissible. Because the trial court properly admitted the evidence Wilson sought to suppress, Wilson’s weight of the evidence claim fails. Therefore, the trial court did not abuse its discretion in denying his request for a new trial. Judgment of sentence affirmed. . Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). . 35 P.S. §§ 780-113(a)(16), (30), (31)(i), and (32), and 18 Pa.C.S. § 903(a), respectively. . Wilson's counsel filed the motion on' November 12, 2015 because the court of common pleas was closed on November 11 for a holiday. Even though Wilson filed his motion more than 30 days after the date of his arraignment, the trial court found that, in the interest of justice, it was appropriate to hear the motiori. The Commonwealth does not challenge this ruling on appeal. . Wilson does not argue that the trial court erred in not suppressing the physical evidence recovered from the hotel room. . The Court held that the warrantless arrest of McFeely in his home was lawful at the time because it had occurred before the Court's decision in Commonwealth v. Williams, 483 Pa. 293, 396 A.2d 1177 (1978), which invalidated warrantless arrests in the home absent exigent circumstances. . Had the Commonwealth briefed this matter, it might have argued that despite the illegal arrest pursuant to a non-existent warrant, the Troopers had at least reasonable suspicion to detain Wilson based on Smith's statements to the Troopers in the parking lot and Wilson having registered the hotel room in his name. That reasonable suspicion arguably ripened into probable cause after the search warrant was executed. Under this analysis, Wilson was at all times lawfully detained, and there would be no basis to suppress his statements. However, because the Commonwealth failed to file a brief making these arguments, we do not address them. . In its opinion, the trial court states that "Trooper Havens testified that he was not aware ... that there were no active warrants [for Wilson] and to not detain Wilson on the warrant ... until well after the preliminary hearing on July 6, 2015.” Trial Ct. Op., 1/26/16, at 9. However, Trooper Havens testified that "[t]he only thing that [he] was made aware of is that [Philadelphia Probation] did not want [Wilson]” and that Philadelphia Probation "didn’t want to extradite [Wilson], so they didn’t want ... him and we could release him.” N.T., 12/29/15, at 28. Further, Trooper Havens testified that he was provided this information "at the state police barracks in the patrol room once [he] got back to the patrol room.” Id. The record is unclear as to what time Trooper Havens returned to the barracks. Id. at 29. Although Trooper Havens testified that he did not know the warrant was bad until after the preliminary hearing, id. at 29, the record does not support the conclusion that Trooper Havens did not know that he could release Wilson.