J-S40020-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DONTAIE ANDERSON | : | |
| | : | |
| Appellant | : | No. 1370 EDA 2022 |

Appeal from the Judgment of Sentence Entered April 28, 2022
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0000936-2019

BEFORE: NICHOLS, J., SULLIVAN, J., and COLINS, J.[*]

MEMORANDUM BY SULLIVAN, J.: **FILED DECEMBER 24, 2024**

Dontaie Anderson ("Anderson") appeals from the judgment of sentence following his convictions for two counts of person not to possess a firearm, carrying a firearm without a license, DUI – Highest Rate, and related offenses.[1] Following our review, we affirm the judgment of sentence in part and vacate in part, and remand for resentencing.

The trial court set forth the underlying factual and procedural history as follows:

> On February 22, 2019, at approximately 2:35 a.m., [Anderson] was driving a blue Honda Pilot on Brookside Road in Lower Macungie Township, Lehigh County, Pennsylvania. The driver's side headlight was out. Troopers David Angstadt [("Trooper Angstadt")] and Timothy McManus [("Trooper

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(2); 75 Pa.C.S.A. § 3802(c).

McManus")] of the Pennsylvania State Police followed [Anderson's] vehicle and observed it turn east onto Hamilton Boulevard. The dash cam footage from the police car also captured the incident.

Trooper Angstadt activated the lights of the police car to initiate a traffic stop at approximately 2:38:45 a.m. Right after the lights were activated, [Anderson] threw something out of his vehicle and turned into the parking lot of the Target store located in the Hamilton Crossings shopping center. The dash cam depicted an object, later identified as a cup, being thrown from the vehicle's front driver's side window while navigating the turn into the parking lot. Once in the parking lot, [Anderson] turned right[,] and another object could be seen being thrown from the front driver's side window. . . . There was not any dispute that a firearm was recovered in the Target parking lot. The firearm was a loaded Harrington and Richardson .32-caliber revolver with four live rounds and one empty round in the cylinder. [Anderson] subsequently stopped and parked his vehicle in a parking space in the Target parking lot.

[Troopers] Angstadt and McManus approached [Anderson's] vehicle with their weapons drawn and directed [Anderson] and his passenger, Robert Anthony Wilson, to put their hands out the windows of the vehicle. Both men were detained, handcuffed, and patted down.

[Anderson] was Mirandized[2] and, when asked if he understood his rights, he visibly nodded in response. [Anderson] was then asked if he wanted to speak with the officer and [he] promptly began speaking, questioning the reason behind the stop. During subsequent questioning, [Anderson] admitted that the gun was his and that he threw it out the window. He also acknowledged that he did not have a concealed carry permit. The officers breathalyzed [Anderson] and determined that he was under the influence of alcohol with a blood alcohol level of 0.18. [A subsequent blood test indicated Anderson's blood alcohol level was .17. Anderson] was arrested for [the offenses stated above].

\* \* \* \*

_____

[2] ***See Miranda v. Arizona***, 384 U.S. 436 (1966).

- 2 -

[Anderson] was charged with two counts of [person not to possess a firearm,] graded as felonies of the first and second degree . . .; carrying a firearm without a license . . .; fleeing or attempting to elude, 75 Pa.C.S.A. § 3733(a) . . .; tampering with evidence, 18 Pa.C.S.A. § 4910(1) . . .; driving under the influence, 75 Pa.C.S.A. § 3802(a)(1) . . .; driving under the influence [-] highest rate of alcohol . . .; [and several related summary offenses].

[Anderson] entered a guilty plea on February 6, 2020 to one count of firearms not to be carried without a license.  The Commonwealth withdrew all the other charges. . . .  During the pendency of the sentencing, [i]n June [] 2020, [Anderson] moved to withdraw his guilty plea.  [I]n July [] 2020, the court conducted a hearing on that motion and granted [the] motion at the close of the hearing. [In August 2020, Anderson moved to recuse the trial judge because, Anderson asserted, he filed a complaint against the judge with the Judicial Conduct Board.  However, Anderson failed to include a certificate of service in his motion, and despite notice by the court that a certificate of service was required, Anderson took no action, and, consequently, the trial court denied the motion in September 2020.]

\* \* \* \*

[Anderson filed pre-trial motions, and i]n December [] 2020, the court conducted a hearing . . . and took the matter under advisement.  [I]n January [] 2021, the court entered an order and opinion denying the motions.  [Anderson, in his *pro se* petition to dismiss, filed in July 2020, asserted that his persons not to possess charge violated U.S. Const. Amend. II.  **See** Pet. to Dismiss, 7/13/20, at 3.  Anderson also raised the issue in a counseled omnibus pre-trial motion.  **See** Omnibus Pre-Trial Mot., 10/8/20, at ¶¶ 20-22.]

[I]n March 2021, [Anderson] filed a petition to recuse [the trial] judge [based on the court's refusal to grant him bail despite his asserted health issues during the COVID-19 pandemic].  The court held a hearing on that motion [i]n April [] 2021[, and then] entered an order denying the motion.

- 3 -

A bifurcated jury trial was held on June 28, 2021. After the initial phase of the trial, [Anderson] was convicted of carrying a firearm without a license, fleeing or attempting to elude, tampering with evidence, driving under the influence, and driving under the influence [-] highest rate of alcohol. Additionally, the jury was presented with an interrogatory asking whether they found that [Anderson] was in possession of a firearm within the Commonwealth of Pennsylvania. The jurors answered that interrogatory in the affirmative. As a result, following the initial phase of the trial, on June 30, 2021, additional evidence was presented to the same panel for the charges of persons not to possess a firearm. [The disqualifying conviction for persons not to possess was a felony "delivery of cocaine" conviction. *See* N.T., 6/30/21, at 122, 132-34.] The jury returned to the deliberation room and reached a verdict of guilty on those counts as well.

Lastly, the Commonwealth withdrew [some summary offenses, and the trial court convicted Anderson of others, none of which are at issue in this appeal]. A presentence investigation report was ordered[,] and sentencing was scheduled for September 30, 2021.

[I]n July [] 2021, [Anderson] filed a motion for [a] new trial, which was denied on July 16, 2021. On July 23, 2021, [he] filed an interlocutory appeal to the Pennsylvania Superior Court, docketed at 1590 EDA 2021. Based on the pendency of that appeal, [Anderson's] sentencing was continued several times. The Superior Court quashed the appeal as interlocutory on January 31, 2022. Upon receiving notice of the Superior Court's order, the Court scheduled sentencing for March 25, 2022.

On March 25, 2022, [Anderson] orally asked for counsel to be withdrawn. After a colloquy with Appellant, the court agreed to dismiss . . . counsel. Sentencing was again postponed until April [] 2022.

On March 31, 2022, [Anderson] filed a petition for writ of habeas corpus, which the court dismissed on April 6, 2022. [Anderson] also filed a [*nunc pro tunc*] petition for allowance of appeal to the Pennsylvania Supreme Court on April 1, 2022 [from the quashal of his interlocutory appeal by the Superior Court]. . ..

On April 11, 2022, [Anderson] filed a petition to recuse the undersigned, which was denied on April 14, 2022.

On April 28, 2022, [the court sentenced Anderson to, *inter alia*,] an aggregate total of not less than seven (7) nor more than twenty (20) years in a state correctional institution[; the sentence was later amended twice, and is not directly at issue in this appeal] . . ..

\* \* \* \*

[Anderson] filed a notice of appeal on May 17, 2022. He also filed a writ of mandamus to recuse [the trial] judge[,] captioned as a Superior Court filing.

[Following an application for counsel by Anderson in the Superior Court and an order by that Court directing the trial court to determine Anderson's eligibility for counsel, the court] scheduled a hearing to determine [Anderson's] eligibility for counsel . . . .

On September 15, 2022, the court conducted that hearing and appointed Kevin Santos, Esq. [("Attorney Santos")] as appellate counsel for [Anderson]. The same day, the Superior Court denied [Anderson's] writ of mandamus to recuse [the trial] judge.

[Eventually,] the [trial] court issued an order pursuant to Pa.R.A.P. 1925(b) directing [Attorney Santos] to file a concise statement [of errors complained of on appeal]. [Atorney Santos] corresponded with [Anderson] and filed a concise statement on March 21, 2023.

Trial Ct. Op., 3/24/23, at 2-7 (some footnotes and unnecessary capitalization omitted).

Following Anderson's appeal to this Court, Attorney Santos filed an

***Anders*** brief and petitioned to withdraw from representation.[3] ***See Anders***

---

[3] ***See Anders v. California***, 386 U.S. 738 (1968); ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009).

Brief, 5/8/23; **see also** Pet. to Withdraw, 5/8/23. This Court denied counsel's petition to withdraw and directed Attorney Santos to file an advocate's brief on the limited issue of whether Anderson's conviction for persons not to possess a firearm violates U.S. Const. Amend. II, pursuant to **New York State Rifle & Association, Inc. v. Bruen**, 597 U.S. 1 (2022). **See** Order, 3/15/24 (**citing Commonwealth v. Wrecks**, 931 A.2d 717, 721 (Pa. Super. 2007) (stating that "if there are non-frivolous issues, we will deny the petition and remand for the filing of an advocate's brief")).[4] Several delays followed

_____

[4] Attorney Santos's **Anders** Brief identified the following issues: (1) whether conviction for persons not to possess a firearm is unconstitutional double jeopardy; (2) whether the charges were proper when there was no judicial determination of probable cause supported by competent evidence; (3) whether the trial court erred in denying Anderson's *pro se* recusal motion; (4) whether the trial court had jurisdiction to sentence Anderson; and (5) whether prior counsel provided ineffective assistance. **See Anders** Brief at 3. Implicit in our order denying Attorney Santos's petition was our conclusion that Attorney Santos had minimally complied with the **Anders** procedure to withdraw and the issues he identified were indeed frivolous. Specifically, (1) Anderson's double jeopardy claim failed because his prior disqualifying conviction was for possession with intent to deliver and the instant conviction for possessing a firearm with a disqualifying conviction did not involve the same conduct, **see Commonwealth v. Gross**, 232 A.3d 819, 835 (Pa. Super. 2020); (2) Anderson's complaints regarding probable cause or a *prima facie* case lacked merit because any defects in the preliminary hearing were harmless when the Commonwealth at trial proves the elements of the charged offenses beyond a reasonable doubt, and he demonstrated no prejudice stemming from the additional charged offenses, **see Commonwealth v. Wilson**, 172 A.3d 605, 610 (Pa. Super. 2017); **Commonwealth v. Ford**, 141 A.3d 547, 555 (Pa. Super. 2016); (3) Anderson failed to show specific evidence of bias, prejudice, or unfairness, support his *pro se* recusal motion, **see Commonwealth v. Harris**, 979 A.2d 387, 391–92 (Pa. Super. 2009); (4) Anderson's appeal from a non-appealable interlocutory order did not preclude the trial court from proceeding to sentencing, **see** Pa.R.A.P.
*(Footnote Continued Next Page)*

due to Attorney Santos withdrawing because of an employment change, the subsequent appointment of two different attorneys by the trial court, and resulting unclarity about who was representing Anderson. *See*, *e.g.*, Order, 5/22/24 (noting the appointment of two different attorneys by the trial court, neither of whom entered an appearance with this Court). Attorney Arley L. Kemmerer ("Attorney Kemmerer") subsequently entered his appearance in this Court and requested a sixty-day extension for briefing, which this Court granted. *See* Order, 6/11/24.[5]

Prior to the filing of Anderson's advocate's brief on the issue of his persons not to possess conviction, the United States Supreme Court issued a decision further specifying the legal framework for analyzing asserted violations of the Second Amendment to the United States Constitution in *United States v. Rahimi*, 602 U.S. 680 (2024). On August 11, 2024, Attorney Kemmerer filed the advocate's brief on behalf of Anderson citing authority including *Rahimi*. The Commonwealth, on or about the due date of its brief, moved for a sixty-day extension of time, based on, *inter alia*, the "importance of this case to both [Anderson] and the Commonwealth."

---

1701(b)(6); *Commonwealth v. Cameron*, 664 A.2d 1364, 1366-67 (Pa. Super. 1995); and (5) Anderson's ineffectiveness claims had to be deferred to collateral review because no exception existed to consider such claims on direct appeal. *See Commonwealth v. Watson*, 310 A.3d 307, 312 (Pa. Super. 2024).

[5] Attorney Santos's appearance is still entered in this case, notwithstanding Attorney Kemmerer's entry of appearance.

Application for Ext. of Time to File Brief, 9/11/24, at ¶ 12. Following the grant of its extension request, the Commonwealth filed a brief with a two-and-a-half-page argument section that failed to mention the recently decided **Rahimi**, despite the fact that the case was decided during the pendency of this appeal and was squarely addressed in Anderson's advocate's brief. **Compare**, **e.g.**, Anderson's Brief at 11 **with** Commonwealth's Brief at 6-8. This case is now ripe for our decision.

Anderson, *via* Attorney Kemmerer, raises the following issue for our review:

> Whether [Anderson's] conviction under 18 Pa.C.S.[A.] § 6105(a)(1) is in violation of [his] Second Amendment right to bear arms when [his] nonviolent felony conviction lacks historical tradition to permanently disarm him as an ordinary citizen whose conviction does not evidence a threat to the physical safety of others.

Anderson's Brief at 3.

Our standard of review for challenges to the constitutionality of criminal statutes is *de novo*, and our scope of review is plenary. **See Commonwealth v. Jenkins**, --- A.3d ----, 2024 WL 5037053 at *5 (Pa. Super. Dec. 9, 2024).

This Court has recently set forth the following principles:

> The Second Amendment states, "A well [] regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. In . . . **Bruen**, the United States Supreme Court clarified the standard courts should apply when evaluating whether a modern firearm regulation violates the Second Amendment and directed courts to examine the "historical tradition of firearm regulation." [597 U.S.] at 17.

*Id*. (internal footnote and some citations omitted).  As for whom "the people"

includes, the United States Supreme Court has explained:

> The first salient feature of the [Second Amendment's] operative clause is that it codifies a "right of the people."  The unamended Constitution and the Bill of Rights use the phrase "right of the people" two other times, in the First Amendment's Assembly–and–Petition Clause and in the Fourth Amendment's Search–and–Seizure Clause.  The Ninth Amendment uses very similar terminology ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people").  All three of these instances unambiguously refer to individual rights, not "collective" rights, or rights that may be exercised only through participation in some corporate body.

*District of Columbia v. Heller*, 554 U.S. 570, 579 (2008) (internal footnote

omitted). Indeed,

> in . . . six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. . . ..
>
> ["]The people["] seems to have been a term of art employed in select parts of the Constitution . . . .  Its uses suggest that ["]the people["]  protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community . . ..

*Id*. (discussing and quoting *United States v. Verdugo-Urquidez*, 494 U.S.

259, 265 (1990)) (internal citation, quotations, and brackets omitted).

Accordingly, there is a "***strong presumption*** that the Second Amendment

right is exercised individually and belongs to all Americans".  *Id.* At 581

(emphasis added).

While the High Court also indicated in *Heller* that its decision

invalidating a law banning handgun possession in the home should not "be

taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . .," 554 U.S. at 626-27, the Court later in **Rahimi** clarified that the inquiry begins with delineation of the contours of the right by looking to the historical tradition of firearms regulations. **See Rahimi**, 602 U.S. at 691 (discussing **Bruen**, 597 U.S. at 22). In sum, rather than rely on a generalized longstanding tradition of banning gun possession by felons, **Rahimi** appears to require all regulations restricting "arms-bearing conduct" to be subject to a "constitutional text and history" analysis, to which we turn next. 602 U.S. at 691.[6]

In **Rahimi**, the High Court explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. . . . A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit . . .." 602 U.S. at 692 (internal citations omitted). "Central to this inquiry," the Court explained, are:

> [w]hy and how the regulation burdens the right . . .. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be

---

[6] In **Commonwealth v. McIntyre**, this Court held that felons are categorically excluded from "the people" for purposes of the right to bear arms, and our Supreme Court vacated the decision in this respect and remanded for reconsideration in light of **Rahimi**. 314 A.3d 828, 843 (Pa. Super. 2024), *vacated*, No. 268 MAL 2024, 2024 WL 4890807 (Pa. Nov. 26, 2024).

compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a dead ringer or a historical twin.

*Id*. (internal citations and quotations omitted).[7] That is, if a challenged regulation addresses a general societal problem that has existed since the eighteenth century, the historical inquiry may be "fairly straightforward," though, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." **Barris v. Stroud Twp.**, 310 A.3d 175, 184 (Pa. 2024) (discussing **Bruen**, 597 U.S. at 26-27). The historical analysis includes temporality (*i.e.,* when the historical analogue was passed, and its proximity to the adoption of the Second Amendment in 1791 and the Fourteenth Amendment in 1868), pervasiveness, longevity, and geographic coverage. **See id**. (discussing, *inter alia*, **Bruen**, 597 U.S. at 46).

Once the threshold question of whether the conduct at issue is covered by the Second Amendment, as is the case with, for example, carrying a firearm publicly for self-defense, "the more difficult question regarding whether [the regulation is] consistent with this Nation's historical tradition of

_____

[7] As a general matter, laws passed by our General Assembly are presumptively constitutional, and it is the burden of the challenger of the law to show its unconstitutionality. **See Commonwealth v. Eid**, 249 A.3d 1030, 1041 (Pa. 2021).

firearm regulation [is] the government's burden to bear." ***Id***. at 186 (citing ***Bruen***, 597 U.S. at 34). Indeed, our Supreme Court has unequivocally directed that "***[w]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to justify its regulation***." ***Rahimi***, 602 U.S. at 691 (internal citation and quotations omitted; emphasis added). Thus, "the government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." ***Barris***, 310 A.3d at 184 (quoting ***Bruen***, 597 U.S. at 19).

Anderson, citing several United States Courts of Appeals decisions, including ***Range v. Att'y Gen. United States of America***, 69 F.4th 96 (3d Cir. 2023), *vacated and remanded*, ***Garland v. Range***, 144 S.Ct. 2706 (2024) (remanding to the Third Circuit for consideration in light of ***Rahimi***), argues there is no historical tradition "supporting a *per se* prohibition of firearm possession for persons convicted of certain offenses." Anderson's Brief at 13. He argues that his conviction for persons not to possess is based on his prior conviction for possession of a controlled substance with intent to deliver, which has no "contemplation of whether . . . the offender . . . poses a threat of physical violence to another." ***Id***. at 15. He maintains that because the statute deprives him of his right to bear arms, "[i]n order for this regulation to withstand the standards set forth in ***Bruen*** and ***Rahimi***, the Commonwealth must demonstrate that [section] 6105[,] as applied to those

convicted [of PWID], is consistent with this Nation's historical tradition of firearm regulation." *Id*.

The Commonwealth, for its part, does not address Anderson's *Rahimi*-based arguments. We observe that despite the Supreme Court's decision in *Rahimi* being issued during the pendency of this appeal, and notwithstanding Anderson's express reliance on that case in his argument, nor the fact that the Commonwealth petitioned for and received a sixty-day extension to respond to Anderson's brief, the Commonwealth nevertheless failed to cite *Rahimi* or attempt to justify, based on a constitutional text and history analysis, the statute at issue regulating arms-bearing conduct. Instead, the Commonwealth, in its two-and-a-half-page brief, principally relies on *McIntyre* for the proposition that felons are not included in "the people" for purposes of Second Amendment analysis, and cursorily asserts a link between drug trafficking and violence.

However, as noted above, *McIntyre*—which concerned a violent felony as the disqualifying offense, and therefore presents a stronger argument for the exclusion of felons from "the people" given the history of disarmament of violent individuals as discussed in *Rahimi*—is in tension with *Heller*, insofar as *Heller* stated that there was a "strong presumption" that "the people" refers to the "class of persons who are part of a national community," and, accordingly, there is a strong presumption that the Second Amendment right belongs to all Americans. 554 U.S. at 579. Consistent with this conclusion,

our Supreme Court has recently vacated and remanded **McIntyre** for reconsideration in light of **Rahimi**. Accordingly, **McIntyre** is no longer controlling legal authority.[8]

Given Anderson's contention that there exists no historical analogue from which the Commonwealth can show a history or tradition of disarming those convicted of nonviolent drug offenses traceable to the time of the adoption of the Second or Fourteenth Amendments, and the Commonwealth's failure to proffer any historical evidence or even a minimal argument based on **Rahimi** and the constitutional text and history analysis prescribed therein, we are constrained to conclude that in this case, the Commonwealth has failed to meet its burden. **See Rahimi**, 602 U.S. at 691 (holding that "[w]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to justify its regulation").[9] Questions the Commonwealth has failed to address include the

---

[8] As discussed in **supra** note 6, our Supreme Court has vacated and remanded **McIntrye** for reconsideration in light of **Rahimi**.

[9] The Commonwealth cites to a single post-**Rahimi** decision by a federal district court denying reconsideration of a denial of a petition for writ of *coram nobis* or *audita querela* in **United States v. Slone**, CR 16-400, 2024 WL 3568571, at *2 (E.D. Pa. July 29, 2024). The court initially denied the petition on jurisdictional grounds on the same day **Rahimi** was decided; it reaffirmed its denial post-**Rahimi**, concluding **Rahimi** did not constitute a change in law to warrant reconsideration of the denial order. **Id**. at *3-*4. The court opined, cursorily, that the generalized link between drug trafficking and violence is sufficient to uphold a ban on possessing firearms by a person convicted of PWID. The analysis in **Slone** does not appear to comport with
*(Footnote Continued Next Page)*

- 14 -

basic prerequisite of identifying an historical analogue from which to discern a tradition or principle for justifying the statute at issue here. *See id*. at 701. Additionally, the High Court has directed a "how and why" analysis, and, even if the "why" were established for the statute at issue, that is, even if it were shown that "laws at the founding regulated firearm use to address particular problems," *see id*. at 692, the Commonwealth has not addressed the "how," that is, the manner of the regulation, in this case, disarmament subject to certain statutory exemptions, is not "to an extent beyond what was done at the founding." *See id*.; *see also* 18 Pa.C.S.A. § 6105(d).

For the foregoing reasons, this Court is constrained to vacate Anderson's convictions for persons not to possess. However, we affirm the remaining convictions. Because our review of the sentences shows that the trial court imposed a combination of concurrent and consecutive sentences for Anderson's several convictions, we remand for resentencing consistent with this memorandum. *See Commonwealth v. Lowe*, 303 A.3d 810, 816 (Pa. Super. 2023) (holding that when a disposition by an appellate court alters the sentencing scheme, the entire sentence should be vacated, and the matter remanded for resentencing).

_____

the analysis prescribed by *Rahimi*; further, we note it is not binding on this Court. *See, e.g.*, *Commonwealth v. Carrera*, 289 A.3d 1127, 1132 n.9 (Pa. Super. 2023). The Commonwealth's single cite to *Sloane* is insufficient to satisfy its burden of justifying the statute at issue with a constitutional text and history analysis.

Judgment of sentence affirmed in part, vacated in part. Case remanded for resentencing consistent with this memorandum. Jurisdiction relinquished.

Judge Colins joins this memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/24/2024