# United States Court of Appeals
## For the First Circuit

No. 24-2043

UNITED STATES,

Appellant,

v.

ALBERTO REBOLLAR-OSORIO,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Kayatta, Circuit Judges.

Brian S. Kleinbord, Assistant United States Attorney, with whom Craig M. Wolff, Acting United States Attorney, was on brief, for appellant.
Jamesa J. Drake, with whom Drake Law LLC was on brief, for appellee.

May 5, 2026

**BARRON**, <u>Chief Judge</u>.  In this case, we must resolve the government's challenge to the dismissal of an indictment that charged Alberto Rebollar Osorio ("Rebollar Osorio") with possessing a firearm as an "alien" "illegally or unlawfully in the United States" in violation of 18 U.S.C. § 922(g)(5)(A).  In that ruling, the United States District Court for the District of Maine determined that, under <u>New York State Rifle & Pistol Ass'n</u> v. <u>Bruen</u>, 597 U.S. 1 (2022), § 922(g)(5)(A) violates the U.S. Constitution's Second Amendment because Rebollar Osorio is among "the people" protected by that Amendment, and the government failed to carry its burden to show that, as applied to him, that statute is consistent with our nation's "tradition of firearm regulation." We reverse, largely for the reasons set forth in <u>United States</u> v. <u>Vizcaíno-Peguero</u>, No. 23-1932, slip op. (1st Cir. May 5, 2026).

## I.

In March 2024, a grand jury in the District of Maine charged Rebollar Osorio with one count of knowingly possessing a firearm as an "alien" "illegally or unlawfully in the United States" in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(8). The former measure makes it unlawful for a person who is an alien "illegally or unlawfully" in this country to possess a firearm.[1]

---

[1] We use the term "alien" in this opinion for consistency with the statutory language.

Id. § 922(g)(5)(A).  The latter measure provides for up to 15 years imprisonment for "knowingly violat[ing]" § 922(g).  Id. § 924(a)(8).

Rebollar Osorio moved to dismiss the indictment on the ground that § 922(g)(5)(A) violates the Second Amendment right to keep and bear arms both on its face and as applied to him.  The government opposed his motion.

Courts confronting Second Amendment challenges must apply the two-step Bruen framework.  United States v. Minor, 165 F.4th 616, 621 (1st Cir. 2026).  The first step focuses on the text of the Second Amendment, which provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  If the challenged regulation falls within the "plain text" of that Amendment, then the court must proceed to the second step, which focuses on this country's history and tradition of firearms regulation.  Minor, 165 F.4th at 621 (quoting Bruen, 597 U.S. at 17).  At that step, "the government bears the burden of demonstrating that the challenged regulation is consistent with this Nation's historical tradition of firearm regulation."  Id. (citation modified).

In opposing Rebollar Osorio's motion to dismiss his indictment, the government contended, with respect to Bruen's first step, that Rebollar Osorio, as an alien illegally or

unlawfully in the United States, is not among "the people" protected by the Second Amendment. The government argued in the alternative that, even if Rebollar Osorio is among "the people" to whom that Amendment refers, his challenge to § 922(g)(5)(A) fails at Bruen's second step. Here, the government argued that the statute, as applied to Rebollar Osorio, is consistent with our nation's history of firearms regulation.

The District Court granted Rebollar Osorio's motion to dismiss his indictment based on his as-applied challenge to § 922(g)(5)(A). It first concluded, based in part on the Supreme Court's decision in United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990), that Rebollar Osorio is among "the people" to whom the Second Amendment refers because he "has established a 'sufficient connection with this country to be considered part of [the national] community.'" (Alteration in original.) The District Court then proceeded to Bruen's second step. There, it reviewed the historical evidence that the government had advanced to defend § 922(g)(5)(A).

The government pointed to founding-era laws that it contended conditioned the right to bear arms on allegiance to the United States and colonial laws that it contended prohibited the arming of Native Americans and the possession of firearms by Catholics. The District Court determined, however, that the government had waived its right to rely on these asserted

- 4 -

precursors to § 922(g)(5)(A) because it had failed to "produce[]" those laws and relied solely on secondary sources referring to them.

The District Court further concluded that the government's remaining asserted precursors -- the English Bill of Rights, early American caselaw, and amendments proposed during the ratification debates that would have guaranteed the right to bear arms to "citizens" -- were not "distinctly similar" or "analogous enough" to § 922(g)(5)(A) "to establish a comparable tradition of firearms regulation." Accordingly, the District Court concluded that the government had not carried its burden under Bruen and dismissed the indictment against Rebollar Osorio.

The government timely appealed.

## II.

Our review is de novo as to each step of the Bruen framework. See Minor, 165 F.4th at 621. In challenging the District Court's ruling regarding Bruen's first step, the government relies on the fact that the Supreme Court has repeatedly referred to "citizens" as possessing the Second Amendment right to keep and bear arms. E.g., District of Columbia v. Heller, 554 U.S. 570, 595 (2008); McDonald v. City of Chicago, 561 U.S. 742, 768 (2010); Bruen, 597 U.S. at 9; United States v. Rahimi, 602 U.S. 680, 691 (2024). The government reasons that these repeated

- 5 -

references show that the "plain text" of that Amendment covers only "citizens" and so, necessarily, not individuals like Rebollar Osorio, who is an alien illegally or unlawfully in this country.

As we explained in Vizcaíno-Peguero, however, if a Second Amendment challenge to § 922(g)(5)(A) fails at the second step of the Bruen framework, there is no reason to resolve the first-step question of whether aliens in this country illegally or unlawfully are among "the people" to whom the Second Amendment refers. See Vizcaíno-Peguero, slip op. at 8-10. And, as we will next explain, Rebollar Osorio's challenge fails at the second step just as the challenge in Vizcaíno-Peguero did. See id. at 29. So, we proceed directly to Bruen's second step.

In Rahimi, the Supreme Court explained that the focus of the second-step inquiry is on "[w]hy and how the [challenged] regulation burdens the right." 602 U.S. at 692. We held in Vizcaíno-Peguero, after accounting for each of those dimensions of the inquiry, that the government had met its burden to show that § 922(g)(5)(A) fits comfortably within the tradition of firearm regulation. Vizcaíno-Peguero, slip op. at 29. We relied there on the evidence that the government advanced concerning the English common-law tradition, colonial measures disarming Native Americans and Catholics, and founding-era laws conditioning the right to bear arms on an individual's allegiance to the sovereign. Id. at 14-16.

- 6 -

In asking us to reach a different conclusion in his case, Rebollar Osorio first contends that the right to keep and bear arms that the Second Amendment secures is broader than the assertedly analogous right that the English Bill of Rights secured.[2] It therefore follows, he argues, that the Second Amendment "repudiated" the English practice of "categorically disarming out-groups." But, while "courts must be careful" when evaluating the import of English common-law practices, Bruen, 597 U.S. at 35, the Second Amendment "codified a right inherited from our English ancestors," id. at 20 (quoting Heller, 554 U.S. at 599). The English tradition thus has been essential to our understanding of that "pre-existing right." Id. (quoting Heller, 554 U.S. at 592); see also Heller, 554 U.S. at 592-93 (surveying English history). So, even though the founding generation "largely eliminated governmental authority to disarm political opponents," Rahimi, 602 U.S. at 694, what matters for present purposes is that the authority to "ban[] the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," id. at 698, was still accepted at that time, cf. Heller, 554 U.S. at 626 (recognizing "longstanding prohibitions" on firearm possession by certain groups). We therefore are not

_____

2 The English Bill of Rights declared "[t]hat the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." 1 W. & M. c. 2, § 7, in 3 Eng. Stat. at Large 417 (1689).

persuaded by Rebollar Osorio's attempt to dismiss as irrelevant the English history that the government invokes and that we relied on in Vizcaíno-Peguero, slip op. at 14, 17-19.

Rebollar Osorio next takes aim at the government's reliance on what he describes as "oddball colonial laws": Virginia disarming a man named Richard Barnes in 1624; Massachusetts disarming Anne Hutchinson, a preacher, in the late 1630s; and New Jersey disarming Moravians, a pacifist denomination of Protestants, during the Seven Years' War. See Range v. Att'y Gen., 69 F.4th 96, 122-24 (3d Cir. 2023) (Krause, J., dissenting) (discussing examples), vacated sub nom., Garland v. Range, 144 S. Ct. 2706 (2024) (mem.). He maintains that these isolated incidents of disarmament "over 150 years before the Second Amendment was ratified" cannot help us understand the tradition of firearm regulation in this country.

The government does not rely only on these three incidents, however. It also points to the English common-law tradition, colonial laws prohibiting the sale of firearms to Native Americans, and colonial- and founding-era measures conditioning firearm possession on loyalty oaths. We thus fail to see why these historical examples should be given no weight in undertaking the inquiry required at Bruen's second step.

Rebollar Osorio next challenges the government's reliance on colonial Virginia's disarmament of Catholics. He does

so on the ground that the government "failed to identify the law with precision," seemingly referring to the absence of a citation to the original statute. But, in addition to the fact that the government did provide the citation in its reply brief, it is clear from Rahimi that secondary sources may be considered, see Rahimi, 602 U.S. at 695-96 (considering secondary sources).

Rebollar Osorio also argues that the historical evidence on which the government relies is inapposite along the "why" dimension of Bruen's second-step inquiry. In his view, the ban in § 922(g)(5)(A) is aimed at "gun violence[,] aliens who behaved dangerously[,] and a concern about lawbreaking." By contrast, he asserts, the historical regulations cited by the government were "racist" measures aimed at the "preservation of a ruling class."

As we explained in Vizcaíno-Peguero, however, the relevant history reveals a longstanding concern about sovereign control over individuals who, although owing a temporary and local allegiance to this country, which subjects them to laws like § 922(g)(5)(A), belong to groups presumed allegiant to a foreign power and have not formally recognized the government's authority. Vizcaíno-Peguero, slip op. at 17-20. And, we further explained there, § 922(g)(5)(A) fits within that tradition as a measure that aims to reduce the threat posed by a group similarly lacking a regulable relationship with the government. Id. at 20-21.

Moreover, we recognized in Vizcaíno-Peguero that some of the measures that establish this tradition would now be unconstitutional on grounds other than the Second Amendment. But we explained in doing so that this fact does not disqualify such measures from serving as historical analogues for Second Amendment purposes. See id. at 26-27. Nor, we note, does Rebollar Osorio claim that there is any reason to think that these regulations violated the Second Amendment right to keep and bear arms when they were in effect.

Finally, Rebollar Osorio turns to the "how" dimension of the second-step inquiry. Here, he contends that the challenged measure effects a permanent, categorical ban on possession for a broad class of people. But, he argues, there is no historical support for imposing a ban of that kind.

As we explained in Vizcaíno-Peguero, the government does not need to show a "distinctly similar" historical analogue to § 922(g)(5)(A). Vizcaíno-Peguero, slip op. at 14 (quoting Bruen, 597 U.S. at 26). It instead needs to identify only "relevantly similar" precursors that, when considered together, establish a history and tradition of firearms regulation that encompasses that measure. Id. (quoting Bruen, 597 at 29). The reason is that § 922(g)(5)(A) implicates a novel societal concern, as it was enacted against the backdrop of our modern immigration framework, which did not exist until the late 19th century. Id. at 18.

Moreover, as we further explained in Vizcaíno-Peguero, § 922(g)(5)(A) is "relevantly similar" to the colonial- and founding-era measures disarming Catholics and British Loyalists in "how" it burdens the right to bear arms. Id. at 22-25. After all, it too allows individuals subject to the restriction the opportunity to restore their right to possess firearms by signaling allegiance and entering the requisite relationship to the relevant government authority in the manner prescribed by that authority. Id. at 24-25.

## III.

For the foregoing reasons, we **reverse** the decision of the District Court and remand for further proceedings consistent with this opinion.